WALTER DOUGLASS, Ad'mr. of WM. S. DOUGLASS,

*vs.*

ROBERT STEPHENS.

*High Court of Errors and Appeals, June T.* 1821.

History, objects and construction of the 2d Sec. 4th Art. of the Constitution of the United States, providing that " the citizens of each State shall be entitled to all privileges and immunities of citizens in the several States."

William S. Douglass, the intestate, a citizen of the State of Delaware, became bound by his bill obligatory, dated the 6th of March, 1813, in the sum of $320, to be paid to Robert Stephens, a citizen of the State of Maryland. William S. Douglass was also indebted at the time of his death, to Walter Douglass, his administrator, a citizen of this State, the plaintiff in this Court, in a large sum of money, on a book account. Stephens brought a suit in the Court of Common Pleas on this bill, against Douglass, the administrator. To this action the defendant below pleaded debts of prior and superior dignity, and insisted that the Act of Assembly directing the the priority of payment of debts within this government (1 *Vol. Del. Laws*, 81) entitled him to retain his debt, in preference to Stephens, a creditor residing out of this State.

Douglass, Adm'r., *v.* Stephens.

The Act of Assembly upon which he relied provides as follows, viz.: " that where any debts are due, by any person whatsoever, to " any of the inhabitants of this Government, in all courts within the " same, priority of judgment and execution for debts due from any " person whatsoever shall be allowed to the inhabitants of this " Government, and that no foreign debt shall be paid by any executor " or administrator, till the debts due to the inhabitants of this " Government be first secured and paid, on penalty to pay the credi- " tors of this Government, as far as the assets in such executors' or " administrators' hands would reach,before such foreign debts were " paid; *Provided*, that the demand be made within six months after " the death of such debtor ; any law, act, custom or usage to the " contrary hereof, in anywise notwithstanding."

The plaintiff below, Stephens, on the other hand, relied upon the provision in the second section of the same Act of Assembly, and on the second section, of Article IV, of the Constitution of the United States, as entitling him to a recovery of his debt, in preference to the inhabitants of this State whose debts are of an inferior order The Act prescribes the payment of debts of a deceased person by an executor or administrator as follows : (1.) Funeral expenses. (2.) Debts due the crown and to the proprietary ; now to the State. (3.) Debts due by judgment obtained in the lifetime of the party deceased. (4.) Debts due by recognizance and for rent. (5.) Debts due by obligation. (6.) Debts due by bill. (7.) Servants' and workmens' wages. (8.) Accounts of merchants and others. The Section of the Constitution, referred to, ordains that " the citi- " zens of each State shall be entitled to all privileges and immuni- " ties of citizens in the several States." The sixth Article of the Constitution declares, that the Constitution, and the laws of the United States, which shall be made in pursuance thereof, and all treaties made, or which shall be made under the authority of the United States, shall be the supreme law of the land; and the judges in every State shall be bound thereby, any thing in the Constitution or laws of any State to the contrary notwithstanding.

The Court of Common Pleas rendered a judgment in favor of Stephens. To reverse that judgment was the object of this writ of error.

*W. Hall*, for the plaintiff in error.

Douglass, Adm'r., *v.* Stephens.

*H. M. Ridgely,* for the defendant in error. .

Ridgely, Chancellor.—I shall consider this case on the broad question, whether the Constitution of the United States places a citizen of the State of Maryland on an equal footing with a citizen of this State, in the recovery of debts. If it does, the judgment of the Court of Common Pleas must be affirmed ; for the Constitution of the United States is the supreme law of the land, and abrogates the laws of every State in the Union inconsistent with it. But if, on the other hand, the term " citizen " is only used in contradistinction to " alien ;" and if the Constitution designed to secure to the citizens of other States the mere right of citizenship, that is, that they shall not be deemed aliens, and to confer no other privileges, then the judgment is erroneous, and should be reversed.

Before the Declaration of Independence the colonist of Great Britain in America, and before and since, the subject of the King of England, in every part of the world, could and can acquire, inherit, and hold land in any of his dominions, as fully as an Englishman can in England. This doctrine was carried so far in *Calvin's case*, that after the union of the crowns of England and Scotland in the person of James I., of England, a Scotchman, born after the Union, was adjudged to be a natural born subject of England, and entitled to the same remedies in the courts of England as an Englishman ; and after the conquest of Ireland by Henry II., and the extension of the British laws to that country, those who were born in Ireland were not aliens to the realm of England. Even those who were born in Calais, from the reign of Edward III. until it was lost in Queen Mary's reign, were capable and inheritable to land in England. See *Calvin's case,* 7 *Coke's Rep.* 1.

Impressed with these established principles, the people of the United States associated in the year 1774 to resist the oppressive and unconstitutional pretensions of the British King and Parliament. They united and acted in concert, as one people. Far from being aliens to each other, they knew that they were practically, as well as legally, fellow-citizens,—holding lands by purchase and inheritance in the respective governments, and enjoying every right and privilege indiscriminately with the inhabitants, only as the same were curtailed in this State by the Statute under consideration. In-

DOUGLASS, Adm'r., *v.* STEPHENS.

deed; so far was this sentiment of community of interest carried that the people of this State were often represented, in their own Legislature and in Congress, by persons who resided in Pennsylvania. After the Declaration of Independence and the adoption of our State Constitution of 1776, Mr. McKean, though resident in Philadelphia, was a member of our General Assembly; and General Dickinson, of New Jersey, and Mr.—————— of Philadelphia were, at another time, Representatives of this State in the Congress of the United States. Mr. McKean actually signed the Articles of Confederation, on behalf of this State, when he presided in the Supreme Court of Pennsylvania. 2 *Del. Laws,* 645 : 1 *Dall. Rep.* 32. After the Declaration of Independence, and before the signing of the Articles of Confederation, each State, possibly, had the power to declare the citizens of other States aliens; but such an exercise of power would have been viewed with a most suspicious, unfriendly eye; and would have violated the great principles of our union. The Articles of Confederation, however, sufficiently restrained any such attempt. In the fourth Article it was agreed, the better to secure and perpetuate mutual friendship and intercourse among the people of the several States in this Union, that " the free inhabitants of each of these States,—paupers, vagabonds " and fugitives from justice excepted,—shall be entitled to all privi- " leges and immunities of free citizens in the several States; and " the people of each State shall have free ingress and regress to and " from any other State; and shall enjoy therein all the privileges of " trade and commerce, subject to the same duties, impositions, and " restrictions as the inhabitants thereof, respectively; *provided,* that " such restrictions shall not extend so far as to prevent the removal " of property imported into any State to any other State, of which " the owner is an inhabitant; *Provided also,* that no imposition of " duties or restrictions shall be laid by any State on the property of " the United States, or either of them." This Article operated in favor of persons not included within the expression or meaning of the present Constitution, if the words " free inhabitants " were intended, as I presume they were, to include all the inhabitants of a State, except slaves. They comprehended aliens, free negroes, and every possible description of persons, not slaves, with the exception of paupers, vagabonds, and fugitives from justice; and they enlarged the privileges and immunities of such free inhabitants,

DOUGLASS, Adm'r., *v.* STEPHENS.

making them equal to the privileges and immunities of the citizens of a State. Nay, the inhabitants of a State might have been entitled to greater privileges in another State than they could enjoy in their own, and to greater than the mere inhabitants themselves were entitled to in such other State. A State might have qualified the citizenship of its own people, but not the citizenship of the inhabitants of a neighboring State, who chose to visit or reside in such State; and thus no State could have protected itself against any class of persons, however worthless or pernicious they might have been to society, if they were tolerated in a neighboring State. A single State might have poured into other States all its miscreants, merely because they were inhabitants. And, in fine, the population of the United States, in relation to foreigners and all kinds of free persons, would have been subject to the control of any particular State favorable to the reception of such persons. The present Constitution has wisely corrected this evil, by vesting the right of naturalization exclusively in the United States, and by using the word "citizens" instead of "free inhabitants." There was another objection to this fourth Article of the Confederation. After employing the most comprehensive words, " privileges and immunities," it descended into a detail of some of those privileges and immunities, and weakened the force of those terms by not including in the detail all the privileges and immunities they were designed to protect. Ingress and regress from one State to another, the privileges of trade and commerce, and the removal of property are the only privileges and immunities enumerated, although the words " privileges and immunities " comprehend all the rights, and all the methods of protecting those rights, which belong to a person in a state of civil society,—subject, to be sure, to some restrictions, but to such only as the welfare of society and the general good require.

It is most evident, from a consideration of this Article, that the idea never was entertained that the people of one State could be taken to be aliens in another. The Article was made, the better to secure and perpetuate what then existed. It conferred no new right, but legalized and preserved such as were then fully enjoyed. It is true, that the Legislatures of the several States might have restricted the privileges previously possessed by the citizens of the other States, and they might have violently made the people aliens to each other ; but, from the date of the ratification of the confed-

eration, their power in this respect was completely limited ; and, without a dissolution of the Confederacy, inhabitancy alone in one State entitled the inhabitants to all privileges and immunities of free citizens in the several States.

Thus stood our Union before the adoption of the present Constitution of the United States. The second section of the fourth Article was designed, if we judge from the words of it and from the whole scope of the Constitution, to restrain to a more definite class of persons the privileges and immunities secured to them, and to extend to the citizens of the several States, in each State, all privileges and immunities of citizens, without implication or construction. The only apparent difficulty in this section arises from the want of a constitutional definition of the word " citizens : " but, by contemplating our manners, the laws enacted before and since the Revolution, the Constitution of the United States and the Statutes of Congress, the meaning of the word " citizen " is as clearly ascertained as any other term or expression which comprehends several attributes or properties.

The word "citizen" imports the same as the word "freeman" in our old Acts of Assembly ; and means every white man, who, by birth-or naturalization, is or may be qualified to exercise and enjoy, under like circumstances, all the rights which any native born, white inhabitant of the State does or can enjoy. And every white man, born or naturalized in any other State, is such a citizen of such other State as to be entitled, in this State, to all the civil rights of citizenship, and by residence and other qualifications to all the political rights.

When men entered into a State they yielded a part of their absolute rights, or natural liberty, for political or civil liberty, which is no other than natural liberty restrained by human laws, so far as is necessary and expedient for the general advantage of the public. The rights of enjoying and defending life and liberty, of acquiring and protecting reputation and property,—and, in general, of attaining objects suitable to their condition, without injury to another, are the rights of a citizen ; and all men by nature have them. See at large *1 Blk. Com. Book I. ch. 1.* But, unless some method had been provided to secure their actual enjoyment, they would be in vain declared, claimed, or asserted   There are, therefore, establish-

ed certain other subordinate rights of the citizen, which serve principally as barriers to protect and maintain inviolate those great and primary rights. The preservation of these original rights includes the preservation of the subordinate rights,—the privileges and immunities which it was intended by the Constitution of this State to preserve to its citizens,and by the Constitution of the United States to preserve, in each State, to the citizens of the other States, for the protection of the primary rights before mentioned.

The right of enjoying and defending life consists in a person's legal and uninterrupted enjoyment of his life, his limbs, his body, his health, and in resisting, even to the commission of homicide, where such resistance is necessary to save one's own life. The right of enjoying and defending life, without the privilege of protecting it by all the means which the law as well as nature, in extreme cases, furnishes, would be illusory to the last degree. Therefore, this privilege belongs to us, and, by the Constitution of the United States, to every other citizen of the United States in common with us.

And so, as to the enjoyment and defence of liberty. To exercise this right every individual entitled to it must have the privilege of locomotion, of changing situation, or removing his person to whatsoever place his inclination may direct, without imprisonment or restraint, unless by due course of law. To secure this right more effectually our constitution (Art. I, Sec. 13,) has declared, that the privilege of *habeas corpus* shall not be suspended, unless when, in cases of rebellion or invasion, the public safety may require it. But, as our Constitution was established for the government of the people of this State, it might be contended that the Legislature may limit its operation to its own citizens, and that the privilege may be withheld from citizens of another State. And, certainly, the argument would be as sound as it is to assert that the Legislature may suspend the privilege of recovering a debt, except on terms of inequality which amount to a prohibition in some instances.

The right of acquiring and protecting reputation and property includes all the privileges incident to such right. Property cannot be acquired and protected without the privilege of applying to courts of justice. No man can be his own arbiter. Our Consti-

tution has declared that all courts shall be open, and every man for an injury done him in his reputation, person, movable or immovable possessions, shall have remedy by due course of law, without sale, denial, or unreasonable delay or expense. This is the assertion of a general right,—the right of all men; and it would be ineffectually declared were not the redress of wrong and the means of enforcing contracts, by which property is acquired, secured and protected. The acquisition of property is effected by contract. A right to property, or the acquisition of property, may be derived either from the act of another or by virtue of some positive institution. When it is derived from another it is generally effected by contract; and it becomes the privilege of every citizen to apply to courts of justice to enforce contracts, or to obtain redress for their violation. It is a privilege which grows out of the right of acquiring property, and is as necessary to its preservation as the air we breathe is to life. Suppose an horse is lent and the borrower refuses to restore him, or suppose an horse to be wrongfully taken, the owner can have remedy by law only. By redressing the injury or wrong the property is protected. So, if an horse is sold, and instead of receiving the price the seller leaves the money in the hands of the purchaser and takes a bond for its payment at a future day, the recovery of this money by a suit at law eventually protects the property. Contract may be traced back to the establishment of exclusive property by civil law; and as contract had its origin in property, so property, or at least property derived from another, now depends on contract. An obligation is a contract, and it is one of the various methods by which property may be acquired; and, therefore, a citizen of another State may claim from the courts of this State the enforcement of his contracts or satisfaction for their breach, precisely as the citizens of this State can; because it is the privilege of a citizen, and is secured to him by the Constitution of the United States. This debt must take its place according to the order of payment prescribed to executors and administrators; otherwise, the creditor will not enjoy in this State all privileges and immunities of citizens; for a common right must be enjoyed by all alike. If his obligation is postponed to a book account, and the obligation of a citizen of the State is preferred to such account, it is certain that he does not,—cannot enjoy all privileges of citizens, where those of this State are entitled to an equality, according to the dignity of their debts. To

what purpose are all privileges and immunities reserved to the citizens of each State, if a State can discriminate between its own citizens and the citizens of another State in the privileges of a citizen, and unless the same method to protect their property is allowed to them. If we may cut and carve and limit and restrain other citizens in the exercise of our privileges as citizens, it is evident that they are not entitled to all privileges and immunities of citizens in this State. To recover a debt is a privilege ; but unless he can recover it equally, or as fully, as a citizen of this State, something is withheld, and he has not the privilege of a citizen in this State,— unless, indeed, more than the privilege of a citizen is bestowed on our own citizens. On the great question of the suability of States, Chief Justice Jay, in his clear and luminous opinion, in *Chisholm vs. Georgia,* 2 *Dall. S. C. Repts.* 472, said "the citizens of America are equal as fellow citizens, and as joint tenants in the sovereignty."

The clause in the Constitution is as general as words can make it ; and the exception contended for would contradict and do violence not only to this section, but to the leading principles of a free and national Government, one great object of which is to insure justice equally to all. It establishes the faith and credit to be given to the public acts, records and judicial proceedings of each State. It provides for the apprehension of fugitives from justice from one State to another ; and it secures to those entitled to the service or labor of another such service or labor, even against the laws or regulations of a State into which such laborer or servant may fly ; and, by this section, the rights of every citizen in the United States are protected in each State, by securing to him in the several States all privileges and immunities of citizenship. Thus, the system is completed ; and most extraordinary would it be if a difference were made in the recovery of debts. If this 2d section of the 4th Article is to be understood with an exception, it is strange that it was not mentioned. The difficulty is to discover in what instance any privilege or immunity of a citizen of one State may be abridged in another. He may purchase and hold land by any of the several modes by which real estate may be acquired. He may take by descent, where the title is vested in him by the operation of law. He may obtain goods and chattels, in all the forms and varieties peculiar to personal property. He may be an executor, administrator, or witness. He may prosecute every species of

60

suit, both at law and in equity ; and, in short, as to every civil right, I know no difference between him and a citizen of the State, unless this Act of Assembly makes one. If this be an exception to the clause of the constitution, and the intention was only to prevent citizens of other States being declared aliens, the Legislature might abolish all the rights, privileges and immunities of the citizens of other States   They might forbid the recovery of debts upon any terms ; the privilege of *habeas corpus* might be disallowed them, and they might be subjected to perpetual imprisonment ; the descent of land to them might be regulated differently from the descent of land generally; immunity from arrest, in suitors and witnesses during their attendance on courts of justice, might be withdrawn ; extraordinary and excessive taxes might be imposed upon the lands of non-residents ; and all the ties by which we are united as one people, so far as they depend upon our own internal State government, might be dissolved.   Why should the citizens of another State be made aliens as to the recovery of debts, and not to all other purposes ?   Thus, indirectly, might be done what it cannot be pretended the State could directly do.   The only reasonable construction to be given to this clause is that of placing all citizens of the United States on the same footing, and extending to them a perfect equality in their rights, privileges and immunities. ⸙ If one citizen has a privilege to which others are not entitled, then they are not entitled to all privileges and immunities of citizens in the several States ; which is directly contrary to this provision. ⸜ The Legislature may certainly prescribe different grades for the payment of debts by executors and administrators ; and in so doing, no violation will be done to the Constitution of the United States, because all persons having debts of the same grade will rank equally.   But a distinction between persons, because one resides in Delaware and the other in Maryland, directly diminishes the privileges of the citizens of Maryland.

Upon the most deliberate consideration of this question, I am of opinion that the citizens of another State—the white citizens I mean—may claim the civil rights, privileges and immunities of citizenship, in the same manner and upon the same terms, that citizens of this State are entitled to them, under similar circumstances.   In the payment of debts by an executor or administrator there can be no other distinction than according to the dignity of the

DOUGLASS, Adm'r., *v.* STEPHENS.

debt. A citizen of Maryland may recover a debt due by obligation or bill, in preference to a debt due to a citizen of this State on account, because the Constitution of the United States gives him the same privilege which is given to a citizen of this State.

As to political rights, the citizens of this and of other States have equal privileges, under like circumstances. If a citizen of Maryland, a white man, of the age of twenty-one years, shall have resided in this State two years next before a general election, and shall have paid a State or county tax, which shall have been assessed at least six months before the election, he is as fully an elector in his proper county as any citizen of the State. And so, with the same qualifications of age, freehold property, residence, inhabitance, he may be elected Representative, Senator or Governor. A citizen of Maryland can, as such, be appointed to no office within a county; but let him become an inhabitant one year, and qualify himself to vote for Representatives, and he will be eligible in the same manner as a citizen of this State. In short, with the same qualifications, and under the like circumstances, every white man who is a citizen of another State is entitled to all the rights, civil and political, and to all privileges and immunities, of citizens of this State

There is another view that may be taken of the first section of this Act of Assembly. The preference given is not confined to citizens only, but it comprehends the inhabitants generally,—citizens and aliens. It places an alien, if he should be an inhabitant of this State, upon higher ground than any citizen of the United States who does not reside in this State. An alien, who never intends to become a citizen, has a preference given him by this Act. This law was enacted in 1721. In the year 1682, and in 1700, Acts of naturalization were passed; and, according to the provision of those Acts, an alien could not become a freeman—one entitled to the rights, privileges and immunities of natural born subjects—without naturalization. The exclusive right of naturalization is now vested in the Congress of the United States; and no State can give an alien a right or privilege greater than the rights or privileges of citizens of the United States. If this could be done in one instance, it could in all; and in this way the exclusive right of naturalization by Congress would be indirectly impaired. The Act of Assembly under consideration has this effect. It gives privileges to aliens, who are inhabitants of the

State, greater than to citizens of other States; and, in this respect, it is repugnant to the Constitution.

Upon the whole, I am of opinion that this first section of the Act of the General Assembly, entitled ' An Act directing the priority of payment of debts of persons dying within this government," is in conflict with the Constitution of the United States; and, there-fore, is void. The judgment of the Court of Common Pleas should be affirmed.

I confine this opinion entirely to the first section of that Act. It, possibly, may be supposed to have some bearing on the first clause of the second section, which authorizes administrators, appointed out of the State, to recover, upon certain terms, debts due to their intestates ; but it is not my intention to express an opinion upon that part of the Act. The clause directing the order of payment of debts by executors and administrators is not in any manner affected by the Constitution of the United States, and stands in full force. This clause is necessarily connected with the present case, and gives to Stephens, the plaintiff below, and to all other citizens of this and of other States, a priority in the recovery of debts due by obli-gation or bill, over or before accounts of merchants and others. Should any question of this kind arise between a citizen, or an inhabitant, of this State, and an inhabitant, not being a citizen, of another State, it would stand uninfluenced by any opinion I have expressed in this case. I have considered the case between citizens of this State and citizens of another State, and none other.

JOHNS, CHIEF JUSTICE.—The question in this case is, whether the Act of Assembly giving a preference to creditors within the State (1 *Vol. Del. Laws*, 81), contravenes the Constitution of the United States and is incompatible with it.

By the second section of the fourth Article of the Constitution of the United States "the citizens of each State shall be entitled to all the privileges and immunities of citizens in the several States."

The words " privileges and immunities " are nearly synonymous. " Privilege " signifies a peculiar advantage, exemption, immunity. " Immunity " signifies exemption, privilege.

The privileges and immunities to be secured to all citizens of

the United States are such only as belong to the citizens of the several States; which includes the whole United States, and must be understood to mean, such privileges as should be common, or the same in every State; and this seems to limit the operation of the clause in the Constitution to federal rules; and to be designed to restrict the powers of Congress as to legislation, so that no privilege or immunity should be granted by it to one citizen of the United States, but such as might be common to all. The language is not that the citizens in any State shall be entitled to all the privileges of citizens in each State. If it was, there would be more plausible ground to say that a citizen of Maryland should have the same privileges and rights in Delaware as a citizen of Delaware is entitled to. But, even supposing the design of this clause of the Constitution to have been to restrict the powers of legislation by the State Legislatures, it cannot be extended so far as that no peculiar advantage can be given by any State to its own citizens, but such as must be extended to all citizens in every State in the Union; because, the privileges secured are not such as are given to citizens in one or more States by the State laws, but must be such as the citizens in the several States, that is, in *all* the States, are entitled to.

The great object to be attained was to prevent a citizen in one State from being considered an alien in another State—to secure the right to acquire and hold real property. Our situation, antecedent to the formation of the first General Government, in 1778, rendered such a provision necessary; and, accordingly, a similar clause was inserted in the Articles of Confederation then adopted; from which the second Section of the fourth Article of the Constitution of the United States was, probably, taken.

The privileges and immunities, &c., are not enumerated or described; but they are all privileges common in the Union,—which certainly excludes those privileges which belong only to citizens of one or more States, and not to those in every other State. It is more easy to ascertain whether the municipal law of this State giving a preference to State creditors is a law incompatible with the privileges secured by the second section of the fourth Article of the Constitution of the United States, than it is to define all the privileges and immunities which the section was intended to secure to the people of the United States; and this will be sufficient for the purpose of deciding the present case.

DOUGLASS, Adm'r., v. STEPHENS.

By the Constitution of the United States all power, jurisdiction, and rights of sovereignty, not granted by that instrument, or relinquished, are retained by the several States.

Uniformity of laws in the States is contemplated only on two subjects, viz.: bankruptcy and naturalization.

The legislative powers of Congress, defined in the eighth section of the first Article, do not interfere with or abridge the power of the States to make local regulations which are to operate within the State.

The restrictive clauses in the tenth section of the first Article of the Constitution of the United States, limiting the powers of the States, are confined to certain enumerated cases; none of which comprehend the subject of the distribution of the assets of a deceased person's estate among his creditors  The local regulations in the States are variant.  In Maryland, I believe, there is no priority given to bond creditors over simple contract creditors.  In this State, the former must be paid before the latter.  It will not be contended that the second section of the fourth Article of the Constitution of the United States repeals that part of our Act of Assembly which gives a preference to bond creditors.  And the effect would be inequitable, to give it such an operation as to repeal another part of the same Act which gives a preference to State creditors; for, then, a Maryland bond creditor might take the whole assets. and exclude simple contract creditors residing in Delaware.

But, it is to be ascertained whether the Act of Assembly is incompatible with the second section of the fourth Article of the Constitution of the United States; and this must depend on the question, whether the right to recover debts out of assets in the hands of an executor or administrator is a privilege intended to be secured by this section.

I am of opinion that the privileges designed to be secured cannot be construed to be any right which a creditor has to recover a debt from the administrator of a deceased person.  This must depend on the laws of each State.  It is neither a right nor a privilege which, according to the words of the section, the citizens of each State are entitled to in the several States.

There is no rule as to the distribution of assets, which is the same

Douglass, Adm'r., *v.* Stephens.

in all the States; nor is this a subject for Congress to legislate on. The rules governing it can only be made by the State Legislatures. If the Maryland creditor has the privilege of commencing and prosecut ng a suit for the recovery of his debt, to be regulated by the municipal laws of this State, he enjoys a privilege which this Article intended to secure to him. The *lex loci* must govern as to the distribution of the fund for payment of debts. To recognize the principle on which the incompatibility is attempted to be supported, will abridge the powers of the States to legislate on many subjects not contemplated by the Constitution. The extent of the operation of the principle, in repealing State laws, it will be difficult to ascertain ; and it would leave us without a rule in many cases. Laws of a similar nature in some of the States,—such as the laws in Maryland and Massachusetts for payment of debts by tendering property at an appraised value,—have been considered to be still in operation ; and this has been sanctioned by Acts of Congress as to debts due to the United States. The attachment laws of Maryland, under which the property of a citizen of a sister State may be seized and sold, have been determined by the Court of Appeals in Maryland to be in force; and it has not been doubted but that our attachment law is yet in force. Our insolvent law, excluding non-residents, is considered to be in operation; and special acts are sometimes passed, to extend it to non-residents. I may refer also to our law of *extent,* and to the Virginia law preventing the sale of land for the payment of debts.

It would be mischievous, and produce much inconvenience, to sanction this new rule as to the settlement of the estates of decedents. Executors and administrators would be involved in difficulties. The practice has been to pay debts within the State in preference to debts due to non-residents, according to the Act of Assembly ; and I cannot see that the Act is in conflict with the Constitution of the United States. The policy and liberality of its continuance must rest with the Legislature. We can only say, *Ita lex scripta est.*

I am, therefore, of opinion that the judgment of the Court below is erroneous, and ought to be reversed.

*Davis* and *Batson, Justices of the Supreme Court,* concurred with Chief Justice Johns.

The judgment was reversed.