SAENZ, DIRECTOR, CALIFORNIA DEPARTMENT OF
SOCIAL SERVICES, ET AL. *v.* ROE ET AL., ON
BEHALF OF THEMSELVES AND ALL
OTHERS SIMILARLY SITUATED

No. 98–97.   Argued January 13, 1999—Decided May 17, 1999

STEVENS, J., delivered the opinion of the Court, in which O'CONNOR, SCALIA, KENNEDY, SOUTER, GINSBURG, and BREYER, JJ., joined. REHNQUIST, C. J., filed a dissenting opinion, in which THOMAS, J., joined, *post*, p. 511. THOMAS, J., filed a dissenting opinion, in which REHNQUIST, C. J., joined, *post*, p. 521.

*Theodore Garelis*, Deputy Attorney General of California, argued the cause for petitioners. With him on the briefs were *Daniel E. Lungren*, Attorney General, *Charlton G. Holland III*, Senior Assistant Attorney General, *Frank S. Furtek*, Supervising Deputy Attorney General, and *Janie L. Daigle*, Deputy Attorney General.

*Solicitor General Waxman* argued the cause for the United States as *amicus curiae* in support of petitioners in part and respondents in part. With him on the brief were *Assistant Attorney General Hunger, Deputy Solicitor General Kneedler, Edward C. DuMont, Mark B. Stern, Kathleen Moriarty Mueller*, and *Peter J. Smith*.

*Mark D. Rosenbaum* argued the cause for respondents. With him on the brief were *David S. Schwartz, Daniel P. Tokaji, Evan H. Caminker, Laurence H. Tribe, Martha F. Davis, Karl Manheim, Steven R. Shapiro, Alan L. Schlosser, Richard Rothschild, Clare Pastore*, and *Jordan C. Budd*.*

---

*Briefs of *amici curiae* urging reversal were filed for the Commonwealth of Pennsylvania et al. by *D. Michael Fisher*, Attorney General, *John G. Knorr III*, Chief Deputy Attorney General, *Betty D. Montgomery*, Attorney General of Ohio, and *Jeffrey S. Sutton*, State Solicitor, and by the Attorneys General for their respective States as follows: *Bill Pryor* of Alabama, *Robert A. Butterworth* of Florida, *Thurbert E. Baker* of Georgia, *Margery S. Bronster* of Hawaii, *J. Joseph Curran, Jr.*, of Maryland, *Hubert H. Humphrey III* of Minnesota, *Joseph P. Mazurek* of Montana, *Frankie Sue Del Papa* of Nevada, *Philip T. McLaughlin* of New Hampshire, *Dennis C. Vacco* of New York, *Michael F. Easley* of North Carolina, *Heidi Heitkamp* of North Dakota, *Jeffrey B. Pine* of Rhode Island, and *Christine O. Gregoire* of Washington; for the Institute for Justice by *Douglas W.*

JUSTICE STEVENS delivered the opinion of the Court.

In 1992, California enacted a statute limiting the maximum welfare benefits available to newly arrived residents. The scheme limits the amount payable to a family that has resided in the State for less than 12 months to the amount payable by the State of the family's prior residence. The questions presented by this case are whether the 1992 statute was constitutional when it was enacted and, if not, whether an amendment to the Social Security Act enacted by Congress in 1996 affects that determination.

## I

California is not only one of the largest, most populated, and most beautiful States in the Nation; it is also one of the most generous. Like all other States, California has participated in several welfare programs authorized by the Social Security Act and partially funded by the Federal Government. Its programs, however, provide a higher level of benefits and serve more needy citizens than those of most other States. In one year the most expensive of those programs, Aid to Families with Dependent Children (AFDC), which was replaced in 1996 with Temporary Assistance to

---

*Kmiec, William H. Mellor,* and *Clint Bolick;* for the National Governors' Association et al. by *Richard Ruda* and *James I. Crowley;* for the Pacific Legal Foundation by *Sharon L. Browne* and *Deborah J. La Fetra;* and for the Washington Legal Foundation et al. by *Daniel J. Popeo* and *Richard A. Samp.*

Briefs of *amici curiae* urging affirmance were filed for ACORN et al. by *Paul M. Dodyk* and *Henry A. Freedman;* for the American Bar Association by *Philip S. Anderson* and *Paul M. Smith;* for the Brennan Center for Justice at New York University School of Law et al. by *Burt Neuborne* and *Deborah Goldberg;* for Catholic Charities USA et al. by *Louis R. Cohen;* for the National Law Center on Homelessness and Poverty by *Ann E. Bushmiller;* for Sixty-six Organizations Serving Domestic Violence Survivors by *Susan Frietsche;* for Social Scientists by *Lawrence S. Lustberg;* and for William Cohen et al. by *Roderick M. Hills, Jr.,* and *Charles S. Sims.*

Needy Families (TANF), provided benefits for an average of 2,645,814 persons per month at an annual cost to the State of $2.9 billion. In California the cash benefit for a family of two—a mother and one child—is $456 a month, but in the neighboring State of Arizona, for example, it is only $275.

In 1992, in order to make a relatively modest reduction in its vast welfare budget, the California Legislature enacted § 11450.03 of the state Welfare and Institutions Code. That section sought to change the California AFDC program by limiting new residents, for the first year they live in California, to the benefits they would have received in the State of their prior residence.[1] Because in 1992 a state program either had to conform to federal specifications or receive a waiver from the Secretary of Health and Human Services in order to qualify for federal reimbursement, § 11450.03 required approval by the Secretary to take effect. In October 1992, the Secretary issued a waiver purporting to grant such approval.

On December 21, 1992, three California residents who were eligible for AFDC benefits filed an action in the Eastern District of California challenging the constitutionality

---

[1] California Welf. & Inst. Code Ann. § 11450.03 (West Supp. 1999) provides:

"(a) Notwithstanding the maximum aid payments specified in paragraph (1) of subdivision (a) of Section 11450, families that have resided in this state for less than 12 months shall be paid an amount calculated in accordance with paragraph (1) of subdivision (a) of Section 11450, not to exceed the maximum aid payment that would have been received by that family from the state of prior residence.

"(b) This section shall not become operative until the date of approval by the United States Secretary of Health and Human Services necessary to implement the provisions of this section so as to ensure the continued compliance of the state plan for the following:

"(1) Title IV of the federal Social Security Act (Subchapter 4 (commencing with Section 601) of Chapter 7 of Title 42 of the United States Code).

"(2) Title IX [sic] of the federal Social Security Act (Subchapter 19 (commencing with Section 1396) of Chapter 7 of Title 42 of the United States Code)."

of the durational residency requirement in § 11450.03. Each plaintiff alleged that she had recently moved to California to live with relatives in order to escape abusive family circumstances. One returned to California after living in Louisiana for seven years, the second had been living in Oklahoma for six weeks and the third came from Colorado. Each alleged that her monthly AFDC grant for the ensuing 12 months would be substantially lower under § 11450.03 than if the statute were not in effect. Thus, the former residents of Louisiana and Oklahoma would receive $190 and $341 respectively for a family of three even though the full California grant was $641; the former resident of Colorado, who had just one child, was limited to $280 a month as opposed to the full California grant of $504 for a family of two.

The District Court issued a temporary restraining order and, after a hearing, preliminarily enjoined implementation of the statute. District Judge Levi found that the statute "produces substantial disparities in benefit levels and makes no accommodation for the different costs of living that exist in different states."[2] Relying primarily on our decisions in *Shapiro* v. *Thompson*, 394 U. S. 618 (1969), and *Zobel* v. *Williams*, 457 U. S. 55 (1982), he concluded that the statute placed "a penalty on the decision of new residents to migrate to the State and be treated on an equal basis with existing residents." *Green* v. *Anderson*, 811 F. Supp. 516, 521 (ED Cal. 1993). In his view, if the purpose of the measure was to deter migration by poor people into the State, it would be unconstitutional for that reason. And even if the purpose was only to conserve limited funds, the State had failed to explain why the entire burden of the saving should be imposed on new residents. The Court of Appeals sum-

[2] The District Court referred to an official table of fair market rents indicating that California's housing costs are higher than any other State except Massachusetts. See *Green* v. *Anderson*, 811 F. Supp. 516, 521, n. 13 (ED Cal. 1993); see also Declaration of Robert Greenstein, App. 91–94.

marily affirmed for the reasons stated by the District Judge. *Green* v. *Anderson,* 26 F. 3d 95 (CA9 1994).

We granted the State's petition for certiorari. 513 U. S. 922 (1994). We were, however, unable to reach the merits because the Secretary's approval of § 11450.03 had been invalidated in a separate proceeding,[3] and the State had acknowledged that the Act would not be implemented without further action by the Secretary. We vacated the judgment and directed that the case be dismissed. *Anderson* v. *Green,* 513 U. S. 557 (1995) *(per curiam).*[4] Accordingly, § 11450.03 remained inoperative until after Congress enacted the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (PRWORA), 110 Stat. 2105.

PRWORA replaced the AFDC program with TANF. The new statute expressly authorizes any State that receives a block grant under TANF to "apply to a family the rules (including benefit amounts) of the [TANF] program . . . of another State if the family has moved to the State from the other State and has resided in the State for less than 12 months." 110 Stat. 2124, 42 U. S. C. § 604(c) (1994 ed., Supp. II). With this federal statutory provision in effect, California no longer needed specific approval from the Secretary to implement § 11450.03. The California Department of Social Services therefore issued an "All County Letter" announcing that the enforcement of § 11450.03 would commence on April 1, 1997.

The All County Letter clarifies certain aspects of the statute. Even if members of an eligible family had lived in California all of their lives, but left the State "on January 29th, intending to reside in another state, and returned on April 15th," their benefits are determined by the law of their State of residence from January 29 to April 15, assuming

---

[3] *Beno* v. *Shalala,* 30 F. 3d 1057 (CA9 1994).

[4] In February 1996, the Secretary granted waivers for certain changes in California's welfare program, but she declined to authorize any distinction between old and new residents. App. to Pet. for Cert. 46–52.

that that level was lower than California's.[5]   Moreover, the lower level of benefits applies regardless of whether the family was on welfare in the State of prior residence and regardless of the family's motive for moving to California. The instructions also explain that the residency requirement is inapplicable to families that recently arrived from another country.

## II

On April 1, 1997, the two respondents filed this action in the Eastern District of California making essentially the same claims asserted by the plaintiffs in *Anderson* v. *Green*,[6] but also challenging the constitutionality of PRWORA's approval of the durational residency requirement.   As in *Green*, the District Court issued a temporary restraining order and certified the case as a class action.[7]   The court also advised the Attorney General of the United States that the constitutionality of a federal statute had been drawn into question, but she did not seek to intervene or to file an *amicus* brief.   Reasoning that PRWORA permitted, but did not require, States to impose durational residency requirements, Judge Levi concluded that the existence of the federal statute did not affect the legal analysis in his prior opinion in *Green*.

He did, however, make certain additional comments on the parties' factual contentions.   He noted that the State did not challenge plaintiffs' evidence indicating that, although

---

[5] Record 30 (Plaintiffs' Exh. 3, Attachment 1).

[6] One of the respondents is a former resident of Oklahoma and the other moved to California from the District of Columbia.   In both of those jurisdictions the benefit levels are substantially lower than in California.

[7] On the stipulation of the parties, the court certified a class of plaintiffs defined as "'all present and future AFDC and TANF applicants and recipients who have applied or will apply for AFDC or TANF on or after April 1, 1997, and who will be denied full California AFDC or TANF benefits because they have not resided in California for twelve consecutive months immediately preceding their application for aid.'"   App. to Pet. for Cert. 20.

California benefit levels were the sixth highest in the Nation in absolute terms,[8] when housing costs are factored in, they rank 18th; that new residents coming from 43 States would face higher costs of living in California; and that welfare benefit levels actually have little, if any, impact on the residential choices made by poor people.   On the other hand, he noted that the availability of other programs such as homeless assistance and an additional food stamp allowance of $1 in stamps for every $3 in reduced welfare benefits partially offset the disparity between the benefits for new and old residents.   Notwithstanding those ameliorating facts, the State did not disagree with plaintiffs' contention that § 11450.03 would create significant disparities between newcomers and welfare recipients who have resided in the State for over one year.

The State relied squarely on the undisputed fact that the statute would save some $10.9 million in annual welfare costs—an amount that is surely significant even though only a relatively small part of its annual expenditures of approximately $2.9 billion for the entire program.   It contended that this cost saving was an appropriate exercise of budgetary authority as long as the residency requirement did not penalize the right to travel.   The State reasoned that the payment of the same benefits that would have been received in the State of prior residency eliminated any potentially punitive aspects of the measure.   Judge Levi concluded, however, that the relevant comparison was not between new residents of California and the residents of their former States, but rather between the new residents and longer term residents of California.   He therefore again enjoined the implementation of the statute.

Without finally deciding the merits, the Court of Appeals affirmed his issuance of a preliminary injunction.   *Roe* v. *Anderson*, 134 F. 3d 1400 (CA9 1998).   It agreed with the

---

[8] Forty-four States and the District of Columbia have lower benefit levels than California.   *Id.*, at 22, n. 10.

District Court's view that the passage of PRWORA did not affect the constitutional analysis, that respondents had established a probability of success on the merits, and that class members might suffer irreparable harm if § 11450.03 became operative. Although the decision of the Court of Appeals is consistent with the views of other federal courts that have addressed the issue,[9] we granted certiorari because of the importance of the case. *Anderson* v. *Roe*, 524 U. S. 982 (1998).[10] We now affirm.

### III

The word "travel" is not found in the text of the Constitution. Yet the "constitutional right to travel from one State to another" is firmly embedded in our jurisprudence. *United States* v. *Guest*, 383 U. S. 745, 757 (1966). Indeed, as Justice Stewart reminded us in *Shapiro* v. *Thompson*, 394 U. S. 618 (1969), the right is so important that it is "assertable against private interference as well as governmental action . . . a virtually unconditional personal right, guaranteed by the Constitution to us all." *Id.*, at 643 (concurring opinion).

---

[9] See *Maldonado* v. *Houston*, 157 F. 3d 179 (CA3 1998) (finding two-tier durational residency requirement an unconstitutional infringement on the right to travel); *Anderson* v. *Green*, 26 F. 3d 95 (CA9 1994), vacated as unripe, 513 U. S. 557 (1995) *(per curiam); Hicks* v. *Peters*, 10 F. Supp. 2d 1008 (ND Ill. 1998) (granting injunction against enforcement of durational residency requirement); *Westenfelder* v. *Ferguson*, 998 F. Supp. 146 (RI 1998) (holding durational residency requirement a penalty on right to travel incapable of surviving rational-basis review). Two state courts have reached the same conclusion. See *Mitchell* v. *Steffen*, 504 N. W. 2d 198 (Minn. 1993), cert. denied, 510 U. S. 1081 (1994) (striking down a similar provision in Minnesota law); *Sanchez* v. *Department of Human Services*, 314 N. J. Super. 11, 713 A. 2d 1056 (1998) (striking down two-tier welfare system); cf. *Jones* v. *Milwaukee County*, 168 Wis. 2d 892, 485 N. W. 2d 21 (1992) (holding that a 60-day waiting period for applicant for general relief is not a penalty and therefore not unconstitutional).

[10] After this case was argued, petitioner Rita L. Saenz replaced Eloise Anderson as Director, California Department of Social Services.

In *Shapiro*, we reviewed the constitutionality of three statutory provisions that denied welfare assistance to residents of Connecticut, the District of Columbia, and Pennsylvania, who had resided within those respective jurisdictions less than one year immediately preceding their applications for assistance. Without pausing to identify the specific source of the right, we began by noting that the Court had long "recognized that the nature of our Federal Union and our constitutional concepts of personal liberty unite to require that all citizens be free to travel throughout the length and breadth of our land uninhibited by statutes, rules, or regulations which unreasonably burden or restrict this movement." *Id.*, at 629. We squarely held that it was "constitutionally impermissible" for a State to enact durational residency requirements for the purpose of inhibiting the migration by needy persons into the State.[11] We further held that a classification that had the effect of imposing a penalty on the exercise of the right to travel violated the Equal Protection Clause "unless shown to be necessary to promote a *compelling* governmental interest," *id.*, at 634, and that no such showing had been made.

In this case California argues that § 11450.03 was not enacted for the impermissible purpose of inhibiting migration by needy persons and that, unlike the legislation reviewed in *Shapiro*, it does not penalize the right to travel because new arrivals are not ineligible for benefits during their first year of residence. California submits that, in-

---

[11] "We do not doubt that the one-year waiting-period device is well suited to discourage the influx of poor families in need of assistance. . . . But the purpose of inhibiting migration by needy persons into the State is constitutionally impermissible." 394 U. S., at 629.

"Thus, the purpose of deterring the in-migration of indigents cannot serve as justification for the classification created by the one-year waiting period . . . . If a law has 'no other purpose . . . than to chill the assertion of constitutional rights by penalizing those who choose to exercise them, then it [is] patently unconstitutional.' *United States* v. *Jackson*, 390 U. S. 570, 581 (1968)." *Id.*, at 631.

stead of being subjected to the strictest scrutiny, the statute should be upheld if it is supported by a rational basis and that the State's legitimate interest in saving over $10 million a year satisfies that test. Although the United States did not elect to participate in the proceedings in the District Court or the Court of Appeals, it has participated as *amicus curiae* in this Court. It has advanced the novel argument that the enactment of PRWORA allows the States to adopt a "specialized choice-of-law-type provision" that "should be subject to an intermediate level of constitutional review," merely requiring that durational residency requirements be "substantially related to an important governmental objective." [12]  The debate about the appropriate standard of review, together with the potential relevance of the federal statute, persuades us that it will be useful to focus on the source of the constitutional right on which respondents rely.

## IV

The "right to travel" discussed in our cases embraces at least three different components. It protects the right of a citizen of one State to enter and to leave another State, the right to be treated as a welcome visitor rather than an unfriendly alien when temporarily present in the second State, and, for those travelers who elect to become permanent residents, the right to be treated like other citizens of that State.

It was the right to go from one place to another, including the right to cross state borders while en route, that was vindicated in *Edwards* v. *California,* 314 U. S. 160 (1941), which invalidated a state law that impeded the free interstate passage of the indigent.  We reaffirmed that right in *United States* v. *Guest,* 383 U. S. 745 (1966), which afforded protection to the "'right to travel freely to and from the State of Georgia and to use highway facilities and other

---

[12] Brief for United States as *Amicus Curiae* 8, 10.

instrumentalities of interstate commerce within the State of Georgia.'" *Id.*, at 757. Given that § 11450.03 imposed no obstacle to respondents' entry into California, we think the State is correct when it argues that the statute does not directly impair the exercise of the right to free interstate movement. For the purposes of this case, therefore, we need not identify the source of that particular right in the text of the Constitution. The right of "free ingress and regress to and from" neighboring States, which was expressly mentioned in the text of the Articles of Confederation,[13] may simply have been "conceived from the beginning to be a necessary concomitant of the stronger Union the Constitution created." *Id.*, at 758.

The second component of the right to travel is, however, expressly protected by the text of the Constitution. The first sentence of Article IV, § 2, provides:

> "The Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States."

Thus, by virtue of a person's state citizenship, a citizen of one State who travels in other States, intending to return home at the end of his journey, is entitled to enjoy the "Privileges and Immunities of Citizens in the several States" that he visits.[14] This provision removes "from the citizens of each State the disabilities of alienage in the other States." *Paul* v. *Virginia*, 8 Wall. 168, 180 (1869) ("[W]ithout some

---

[13] "The 4th article, respecting the *[sic]* extending the rights of the Citizens of each State, throughout the United States . . . is formed exactly upon the principles of the 4th article of the present Confederation." 3 Records of the Federal Convention of 1787, p. 112 (M. Farrand ed. 1966). Article IV of the Articles of Confederation provided that "the people of each State shall have free ingress and regress to and from any other State."

[14] *Corfield* v. *Coryell*, 6 F. Cas. 546 (No. 3,230) (CCED Pa. 1823) (Washington, J., on circuit) ("fundamental" rights protected by the Privileges and Immunities Clause include "the right of a citizen of one state to pass through, or to reside in any other state").

provision . . . removing from the citizens of each State the disabilities of alienage in the other States, and giving them equality of privilege with citizens of those States, the Republic would have constituted little more than a league of States; it would not have constituted the Union which now exists"). It provides important protections for nonresidents who enter a State whether to obtain employment, *Hicklin* v. *Orbeck*, 437 U. S. 518 (1978), to procure medical services, *Doe* v. *Bolton*, 410 U. S. 179, 200 (1973), or even to engage in commercial shrimp fishing, *Toomer* v. *Witsell*, 334 U. S. 385 (1948). Those protections are not "absolute," but the Clause "does bar discrimination against citizens of other States where there is no substantial reason for the discrimination beyond the mere fact that they are citizens of other States." *Id.,* at 396. There may be a substantial reason for requiring the nonresident to pay more than the resident for a hunting license, see *Baldwin* v. *Fish and Game Comm'n of Mont.,* 436 U. S. 371, 390–391 (1978), or to enroll in the state university, see *Vlandis* v. *Kline,* 412 U. S. 441, 445 (1973), but our cases have not identified any acceptable reason for qualifying the protection afforded by the Clause for "the 'citizen of State A who ventures into State B' to settle there and establish a home." *Zobel,* 457 U. S., at 74 (O'CONNOR, J., concurring in judgment). Permissible justifications for discrimination between residents and nonresidents are simply inapplicable to a nonresident's exercise of the right to move into another State and become a resident of that State.

What is at issue in this case, then, is this third aspect of the right to travel—the right of the newly arrived citizen to the same privileges and immunities enjoyed by other citizens of the same State. That right is protected not only by the new arrival's status as a state citizen, but also by her status as a citizen of the United States.[15] That additional source

---

[15] The Framers of the Fourteenth Amendment modeled this Clause upon the "Privileges and Immunities" Clause found in Article IV. Cong. Globe, 39th Cong., 1st Sess., 1033–1034 (1866) (statement of Rep. Bingham). In

of protection is plainly identified in the opening words of the Fourteenth Amendment:

> "All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; . . . ."[16]

Despite fundamentally differing views concerning the coverage of the Privileges or Immunities Clause of the Fourteenth Amendment, most notably expressed in the majority and dissenting opinions in the *Slaughter-House Cases*, 16 Wall. 36 (1873), it has always been common ground that this Clause protects the third component of the right to travel. Writing for the majority in the *Slaughter-House Cases*, Justice Miller explained that one of the privileges conferred by this Clause "is that a citizen of the United States can, of his own volition, become a citizen of any State of the Union by a *bonâ fide* residence therein, with the same rights as other citizens of that State." *Id.*, at 80. Justice Bradley, in dissent, used even stronger language to make the same point:

> "The states have not now, if they ever had, any power to restrict their citizenship to any classes or persons. A citizen of the United States has a perfect constitutional

*Dred Scott* v. *Sandford*, 19 How. 393 (1857), this Court had limited the protection of Article IV to rights under state law and concluded that free blacks could not claim citizenship. The Fourteenth Amendment overruled this decision. The Amendment's Privileges or Immunities Clause and Citizenship Clause guaranteed the rights of newly freed black citizens by ensuring that they could claim the state citizenship of any State in which they resided and by precluding that State from abridging their rights of national citizenship.

[16] U. S. Const., Amdt. 14, §1. The remainder of the section provides: "nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

right to go to and reside in any State he chooses, and to claim citizenship therein, and an equality of rights with every other citizen; and the whole power of the nation is pledged to sustain him in that right. He is not bound to cringe to any superior, or to pray for any act of grace, as a means of enjoying all the rights and privileges enjoyed by other citizens." *Id.*, at 112–113.

That newly arrived citizens "have two political capacities, one state and one federal," adds special force to their claim that they have the same rights as others who share their citizenship.[17] Neither mere rationality nor some intermediate standard of review should be used to judge the constitutionality of a state rule that discriminates against some of its citizens because they have been domiciled in the State for less than a year. The appropriate standard may be more categorical than that articulated in *Shapiro*, see *supra*, at 499, but it is surely no less strict.

## V

Because this case involves discrimination against citizens who have completed their interstate travel, the State's argument that its welfare scheme affects the right to travel only "incidentally" is beside the point. Were we concerned solely with actual deterrence to migration, we might be persuaded that a partial withholding of benefits constitutes a lesser incursion on the right to travel than an outright denial of all benefits. See *Dunn* v. *Blumstein*, 405 U. S. 330, 339 (1972).

---

[17] "Federalism was our Nation's own discovery. The Framers split the atom of sovereignty. It was the genius of their idea that our citizens would have two political capacities, one state and one federal, each protected from incursion by the other. The resulting Constitution created a legal system unprecedented in form and design, establishing two orders of government, each with its own direct relationship, its own privity, its own set of mutual rights and obligations to the people who sustain it and are governed by it." *U. S. Term Limits, Inc.* v. *Thornton*, 514 U. S. 779, 838 (1995) (KENNEDY, J., concurring).

But since the right to travel embraces the citizen's right to. be treated equally in her new State of residence, the discriminatory classification is itself a penalty.

It is undisputed that respondents and the members of the class that they represent are citizens of California and that their need for welfare benefits is unrelated to the length of time that they have resided in California. We thus have no occasion to consider what weight might be given to a citizen's length of residence if the bona fides of her claim to state citizenship were questioned. Moreover, because whatever benefits they receive will be consumed while they remain in California, there is no danger that recognition of their claim will encourage citizens of other States to establish residency for just long enough to acquire some readily portable benefit, such as a divorce or a college education, that will be enjoyed after they return to their original domicile. See, *e. g.*, *Sosna* v. *Iowa*, 419 U. S. 393 (1975); *Vlandis* v. *Kline*, 412 U. S. 441 (1973).

The classifications challenged in this case—and there are many—are defined entirely by (a) the period of residency in California and (b) the location of the prior residences of the disfavored class members. The favored class of beneficiaries includes all eligible California citizens who have resided there for at least one year, plus those new arrivals who last resided in another country or in a State that provides benefits at least as generous as California's. Thus, within the broad category of citizens who resided in California for less than a year, there are many who are treated like lifetime residents. And within the broad subcategory of new arrivals who are treated less favorably, there are many smaller classes whose benefit levels are determined by the law of the States from whence they came. To justify § 11450.03, California must therefore explain not only why it is sound fiscal policy to discriminate against those who have been citizens for less than a year, but also why it is permissible to apply such a variety of rules within that class.

These classifications may not be justified by a purpose to deter welfare applicants from migrating to California for three reasons. First, although it is reasonable to assume that some persons may be motivated to move for the purpose of obtaining higher benefits, the empirical evidence reviewed by the District Judge, which takes into account the high cost of living in California, indicates that the number of such persons is quite small—surely not large enough to justify a burden on those who had no such motive.[18]   Second, California has represented to the Court that the legislation was not enacted for any such reason.[19]   Third, even if it were, as we squarely held in *Shapiro* v. *Thompson,* 394 U. S. 618 (1969), such a purpose would be unequivocally impermissible.

Disavowing any desire to fence out the indigent, California has instead advanced an entirely fiscal justification for its multitiered scheme.   The enforcement of § 11450.03 will save the State approximately $10.9 million a year.   The question is not whether such saving is a legitimate purpose but whether the State may accomplish that end by the discriminatory means it has chosen.   An evenhanded, across-the-board reduction of about 72 cents per month for every beneficiary would produce the same result.   But our negative answer to the question does not rest on the weakness of the State's purported fiscal justification.   It rests on the fact that the Citizenship Clause of the Fourteenth Amendment expressly equates citizenship with residence: "That Clause does not provide for, and does not allow for, degrees of citizenship based on length of residence." *Zobel,* 457 U. S., at 69.   It is equally clear that the Clause does not tolerate a hierarchy of 45 subclasses of similarly situated

---

[18] App. 21–26.

[19] The District Court and the Court of Appeals concluded, however, that the "apparent purpose of § 11450.03 was to deter migration of poor people to California." *Roe* v. *Anderson,* 134 F. 3d 1400, 1404 (CA9 1998).

citizens based on the location of their prior residence.[20] Thus § 11450.03 is doubly vulnerable: Neither the duration of respondents' California residence, nor the identity of their prior States of residence, has any relevance to their need for benefits. Nor do those factors bear any relationship to the State's interest in making an equitable allocation of the funds to be distributed among its needy citizens. As in *Shapiro*, we reject any contributory rationale for the denial of benefits to new residents:

> "But we need not rest on the particular facts of these cases. Appellants' reasoning would logically permit the State to bar new residents from schools, parks, and libraries or deprive them of police and fire protection. Indeed it would permit the State to apportion all benefits and services according to the past tax contributions of its citizens." 394 U. S., at 632–633.

See also *Zobel*, 457 U. S., at 64. In short, the State's legitimate interest in saving money provides no justification for its decision to discriminate among equally eligible citizens.

## VI

The question that remains is whether congressional approval of durational residency requirements in the 1996 amendment to the Social Security Act somehow resuscitates the constitutionality of § 11450.03. That question is readily answered, for we have consistently held that Congress may not authorize the States to violate the Fourteenth Amendment.[21] Moreover, the protection afforded to the citizen by

---

[20] See Cohen, Discrimination Against New State Citizens: An Update, 11 Const. Comm. 73, 79 (1994) ("[J]ust as it would violate the Constitution to deny these new arrivals state citizenship, it would violate the Constitution to concede their citizenship in name only while treating them as if they were still citizens of other states").

[21] "'Congress is without power to enlist state cooperation in a joint federal-state program by legislation which authorizes the States to violate the Equal Protection Clause.' *Shapiro* v. *Thompson*, 394 U. S. 618, 641 (1969)." *Townsend* v. *Swank*, 404 U. S. 282, 291 (1971).

the Citizenship Clause of that Amendment is a limitation on the powers of the National Government as well as the States.

Article I of the Constitution grants Congress broad power to legislate in certain areas. Those legislative powers are, however, limited not only by the scope of the Framers' affirmative delegation, but also by the principle "that they may not be exercised in a way that violates other specific provisions of the Constitution. For example, Congress is granted broad power to 'lay and collect Taxes,' but the taxing power, broad as it is, may not be invoked in such a way as to violate the privilege against self-incrimination." *Williams* v. *Rhodes*, 393 U. S. 23, 29 (1968) (footnote omitted). Congress has no affirmative power to authorize the States to violate the Fourteenth Amendment and is implicitly prohibited from passing legislation that purports to validate any such violation.

> "Section 5 of the Fourteenth Amendment gives Congress broad power indeed to enforce the command of the amendment and 'to secure to all persons the enjoyment of perfect equality of civil rights and the equal protection of the laws against State denial or invasion. . . .' *Ex parte Virginia*, 100 U. S. 339, 346 (1880). Congress' power under § 5, however, 'is limited to adopting measures to enforce the guarantees of the Amendment; § 5 grants Congress no power to restrict, abrogate, or dilute these guarantees.' *Katzenbach* v. *Morgan*, 384 U. S. 641, 651, n. 10 (1966). Although we give deference to congressional decisions and classifications, neither Congress nor a State can validate a law that denies the rights guaranteed by the Fourteenth Amendment. See, *e. g.*, *Califano* v. *Goldfarb*, 430 U. S. 199, 210 (1977); *Williams* v. *Rhodes*, 393 U. S. 23, 29 (1968)." *Mississippi Univ. for Women* v. *Hogan*, 458 U. S. 718, 732–733 (1982).

The Solicitor General does not unequivocally defend the constitutionality of § 11450.03. But he has argued that two features of PRWORA may provide a sufficient justification for state durational requirements to warrant further inquiry before finally passing on the section's validity, or perhaps that it is only invalid insofar as it applies to new arrivals who were not on welfare before they arrived in California.[22]

He first points out that because the TANF program gives the States broader discretion than did AFDC, there will be significant differences among the States which may provide new incentives for welfare recipients to change their residences. He does not, however, persuade us that the disparities under the new program will necessarily be any greater than the differences under AFDC, which included such examples as the disparity between California's monthly benefit of $673 for a family of four with Mississippi's benefit of $144 for a comparable family. Moreover, we are not convinced that a policy of eliminating incentives to move to California provides a more permissible justification for classifying California citizens than a policy of imposing special burdens on new arrivals to deter them from moving into the State. Nor is the discriminatory impact of § 11450.03 abated by repeatedly characterizing it as "a sort of specialized choice-of-law rule."[23] California law alone discriminates among its own citizens on the basis of their prior residence.

The Solicitor General also suggests that we should recognize the congressional concern addressed in the legislative history of PRWORA that the "States might engage in a 'race to the bottom' in setting the benefit levels in their TANF

---

[22] Brief for United States as *Amicus Curiae* 29, n. 10.

[23] *Id.*, at 9; see also *id.*, at 3, 8, 14, 15, 20, 22, 23, 24, 27, 28, 28–29.

programs."[24]    Again, it is difficult to see why that concern should be any greater under TANF than under AFDC.   The evidence reviewed by the District Court indicates that the savings resulting from the discriminatory policy, if spread equitably throughout the entire program, would have only a miniscule impact on benefit levels.   Indeed, as one of the legislators apparently interpreted this concern, it would logically prompt the States to reduce benefit levels sufficiently "to encourage emigration of benefit recipients."[25]    But speculation about such an unlikely eventuality provides no basis for upholding § 11450.03.

Finally, the Solicitor General suggests that the State's discrimination might be acceptable if California had limited the disfavored subcategories of new citizens to those who had received aid in their prior State of residence at any time within the year before their arrival in California.   The suggestion is ironic for at least three reasons: It would impose the most severe burdens on the neediest members of the disfavored classes; it would significantly reduce the savings that the State would obtain, thus making the State's claimed justification even less tenable; and, it would confine the effect of the statute to what the Solicitor General correctly characterizes as "the invidious purpose of discouraging poor people generally from settling in the State."[26]

*    *    *

Citizens of the United States, whether rich or poor, have the right to choose to be citizens "of the State wherein they

---

[24] *Id.*, at 8.   See H. R. Rep. No. 104–651, p. 1337 (1996) ("States that want to pay higher benefits should not be deterred from doing so by the fear that they will attract large numbers of recipients from bordering States").

[25] Brief for United States as *Amicus Curiae* 16.   See States' Perspective on Welfare Reform: Hearing before the Senate Committee on Finance, 104th Cong., 1st Sess., 9 (1995).

[26] Brief for United States as *Amicus Curiae* 30, n. 11.

reside." U. S. Const., Amdt. 14, § 1. The States, however, do not have any right to select their citizens.[27] The Fourteenth Amendment, like the Constitution itself, was, as Justice Cardozo put it, "framed upon the theory that the peoples of the several states must sink or swim together, and that in the long run prosperity and salvation are in union and not division." *Baldwin* v. *G. A. F. Seelig, Inc.*, 294 U. S. 511, 523 (1935).

The judgment of the Court of Appeals is affirmed.

*It is so ordered.*

CHIEF JUSTICE REHNQUIST, with whom JUSTICE THOMAS joins, dissenting.

The Court today breathes new life into the previously dormant Privileges or Immunities Clause of the Fourteenth Amendment—a Clause relied upon by this Court in only one other decision, *Colgate* v. *Harvey*, 296 U. S. 404 (1935), overruled five years later by *Madden* v. *Kentucky*, 309 U. S. 83 (1940). It uses this Clause to strike down what I believe is a reasonable measure falling under the head of a "good-faith residency requirement." Because I do not think any provision of the Constitution—and surely not a provision relied upon for only the second time since its enactment 130 years ago—requires this result, I dissent.

I

Much of the Court's opinion is unremarkable and sound. The right to travel clearly embraces the right to go from one place to another, and prohibits States from impeding the

---

[27] As Justice Jackson observed: "[I]t is a privilege of citizenship of the United States, protected from state abridgment, to enter any State of the Union, either for temporary sojourn or for the establishment of permanent residence therein and for gaining resultant citizenship thereof. If national citizenship means less than this, it means nothing." *Edwards* v. *California*, 314 U. S. 160, 183 (1941) (concurring opinion).

free interstate passage of citizens. The state law in *Edwards* v. *California*, 314 U. S. 160 (1941), which prohibited the transport of any indigent person into California, was a classic barrier to travel or migration and the Court rightly struck it down. Indeed, for most of this country's history, what the Court today calls the first "component" of the right to travel, *ante*, at 500, was the entirety of this right. As Chief Justice Taney stated in his dissent in the *Passenger Cases*, 7 How. 283 (1849):

> "We are all citizens of the United States; and, as members of the same community, must have the right to pass and repass through every part of it without interruption, as freely as in our own States. And a tax imposed by a State for entering its territories or harbours is inconsistent with the rights which belong to the citizens of other States as members of the Union, and with the objects which that Union was intended to attain. Such a power in the States could produce nothing but discord and mutual irritation, and they very clearly do not possess it." *Id.*, at 492.

See also *Crandall* v. *Nevada*, 6 Wall. 35, 44 (1868); *Williams* v. *Fears*, 179 U. S. 270, 274 (1900); *Memorial Hospital* v. *Maricopa County*, 415 U. S. 250, 280–283 (1974) (REHNQUIST, J., dissenting) (collecting and discussing cases). The Court wisely holds that because Cal. Welf. & Inst. Code Ann. § 11450.03 (West Supp. 1999) imposes no obstacle to respondents' entry into California, the statute does not infringe upon the right to travel. See *ante*, at 501. Thus, the traditional conception of the right to travel is simply not an issue in this case.

I also have no difficulty with aligning the right to travel with the protections afforded by the Privileges and Immunities Clause of Article IV, § 2, to nonresidents who enter other States "intending to return home at the end of [their] journey." See *ante*, at 501. Nonresident visitors of other

States should not be subject to discrimination solely because they live out of State. See *Paul* v. *Virginia*, 8 Wall. 168 (1869); *Hicklin* v. *Orbeck*, 437 U. S. 518 (1978). Like the traditional right-to-travel guarantees discussed above, however, this Clause has no application here, because respondents expressed a desire to stay in California and become citizens of that State. Respondents therefore plainly fall outside the protections of Article IV, § 2.

Finally, I agree with the proposition that a "citizen of the United States can, of his own volition, become a citizen of any State of the Union by a *bonâ fide* residence therein, with the same rights as other citizens of that State." *Slaughter-House Cases*, 16 Wall. 36, 80 (1873).

But I cannot see how the right to become a citizen of another State is a necessary "component" of the right to travel, or why the Court tries to marry these separate and distinct rights. A person is no longer "traveling" in any sense of the word when he finishes his journey to a State which he plans to make his home. Indeed, under the Court's logic, the protections of the Privileges or Immunities Clause recognized in this case come into play only when an individual *stops* traveling with the intent to remain and become a citizen of a new State. The right to travel and the right to become a citizen are distinct, their relationship is not reciprocal, and one is not a "component" of the other. Indeed, the same dicta from the *Slaughter-House Cases* quoted by the Court actually treat the right to become a citizen and the right to travel as separate and distinct rights under the Privileges or Immunities Clause of the Fourteenth Amendment. See *id.*, at 79–80.[1] At most, restrictions on an indi-

---

[1] The Court's decision in the *Slaughter-House Cases* only confirms my view that state infringement on the right to travel is limited to the kind of barrier established in *Edwards* v. *California*, 314 U. S. 160 (1941), and its discussion is worth quoting in full:

"But lest it should be said that no such privileges and immunities are to be found if those we have been considering are excluded, we venture

vidual's right to become a citizen indirectly affect his calculus in deciding whether to exercise his right to travel in the first place, but such an attenuated and uncertain relationship is no ground for folding one right into the other.

No doubt the Court has, in the past 30 years, essentially conflated the right to travel with the right to equal state citizenship in striking down durational residence requirements similar to the one challenged here. See, *e. g., Shapiro* v. *Thompson,* 394 U. S. 618 (1969) (striking down 1-year residence before receiving any welfare benefit); *Dunn* v. *Blumstein,* 405 U. S. 330 (1972) (striking down 1-year residence before receiving the right to vote in state elections); *Maricopa County,* 415 U. S., at 280–283 (striking down 1-year county residence before receiving entitlement to nonemergency hospitalization or emergency care). These cases marked a sharp departure from the Court's prior right-to-travel cases because in none of them was travel itself prohibited. See *id.,* at 254–255 ("Whatever its ultimate scope . . . the right to travel was involved in only a limited sense in *Shapiro*"); *Shapiro, supra,* at 671–672 (Harlan, J., dissenting).

Instead, the Court in these cases held that restricting the provision of welfare benefits, votes, or certain medical bene-

---

to suggest some which own their existence to the Federal government, its National character, its Constitution, or its laws.

"One of these is well described in the case of *Crandall* v. *Nevada*[, 6 Wall. 35 (1868)]. It is said to be the right of the citizen of this great country, protected by implied guarantees of its Constitution, 'to come to the seat of government to assert any claim he may have upon that government, to transact any business he may have with it, to seek its protection, to share its offices, to engage in administering its functions. He has the right of free access to its seaports, through which all operations of foreign commerce are conducted, to the subtreasuries, land offices, and courts of justice in the several States.' And quoting from the language of Chief Justice Taney in another case, it is said 'that *for all the great purposes for which the Federal government* was established, we are one people, with one common country, *we are all citizens of the United States;*' and it is, as such citizens, that their rights are supported in this court in *Crandall* v. *Nevada.*" 16 Wall., at 79 (footnote omitted).

fits to new citizens for a limited time impermissibly "penalized" them under the Equal Protection Clause of the Fourteenth Amendment for having exercised their right to travel. See *Maricopa County, supra,* at 257. The Court thus settled for deciding what restrictions amounted to "deprivations of very important benefits and rights" that operated to indirectly "penalize" the right to travel. See *Attorney General of N. Y.* v. *Soto-Lopez,* 476 U. S. 898, 907 (1986) (plurality opinion). In other cases, the Court recognized that laws dividing new and old residents had little to do with the right to travel and merely triggered an inquiry into whether the resulting classification rationally furthered a legitimate government purpose. See *Zobel* v. *Williams,* 457 U. S. 55, 60, n. 6 (1982); *Hooper* v. *Bernalillo County Assessor,* 472 U. S. 612, 618 (1985).[2] While *Zobel* and *Hooper* reached the wrong result in my view, they at least put the Court on the proper track in identifying exactly what interests it was protecting; namely, the right of individuals not to be subject to unjustifiable classifications as opposed to infringements on the right to travel.

The Court today tries to clear much of the underbrush created by these prior right-to-travel cases, abandoning its effort to define what residence requirements deprive individuals of "important rights and benefits" or "penalize" the right to travel. See *ante,* at 504–507. Under its new analytical framework, a State, outside certain ill-defined circumstances, cannot classify its citizens by the length of their residence in the State without offending the Privileges or Immunities Clause of the Fourteenth Amendment. The Court thus departs from *Shapiro* and its progeny, and, while paying lipservice to the right to travel, the Court does

---

[2] As Chief Justice Burger aptly stated in *Zobel:* "In reality, right to travel analysis refers to little more than a particular application of equal protection analysis. Right to travel cases have examined, in equal protection terms, state distinctions between newcomers and longer term residents." 457 U. S., at 60, n. 6.

little to explain how the right to travel is involved at all. Instead, as the Court's analysis clearly demonstrates, see *ante,* at 504–507, this case is only about respondents' right to immediately enjoy all the privileges of being a California citizen in relation to that State's ability to test the good-faith assertion of this right. The Court has thus come full circle by effectively disavowing the analysis of *Shapiro,* segregating the right to travel and the rights secured by Article IV from the right to become a citizen under the Privileges or Immunities Clause, and then testing the residence requirement here against this latter right. For all its misplaced efforts to fold the right to become a citizen into the right to travel, the Court has essentially returned to its original understanding of the right to travel.

## II

In unearthing from its tomb the right to become a state citizen and to be treated equally in the new State of residence, however, the Court ignores a State's need to assure that only persons who establish a bona fide residence receive the benefits provided to current residents of the State. The *Slaughter-House* dicta at the core of the Court's analysis specifically condition a United States citizen's right to "become a citizen of any state of the Union" and to enjoy the "same rights as other citizens of that State" on the establishment of a *"bonâ fide residence therein."* 16 Wall., at 80 (emphasis added). Even when redefining the right to travel in *Shapiro* and its progeny, the Court has "always carefully distinguished between bona fide residence requirements, which seek to differentiate between residents and non-residents, and residence requirements, such as durational, fixed date, and fixed point residence requirements, which treat established residents differently based on the time they migrated into the State." *Soto-Lopez, supra,* at 903, n. 3 (citing cases).

Thus, the Court has consistently recognized that while new citizens must have the same opportunity to enjoy the privileges of being a citizen of a State, the States retain the ability to use bona fide residence requirements to ferret out those who intend to take the privileges and run. As this Court explained in *Martinez* v. *Bynum*, 461 U. S. 321, 328–329 (1983): "A bona fide residence requirement, appropriately defined and uniformly applied, furthers the substantial state interest in assuring that services provided for its residents are enjoyed only by residents. . . . A bona fide residence requirement simply requires that the person *does* establish residence before demanding the services that are restricted to residents." The *Martinez* Court explained that "residence" requires "both physical presence and an intention to remain," see *id.*, at 330, and approved a Texas law that restricted eligibility for tuition-free education to families who met this minimum definition of residence, *id.*, at 332–333.

While the physical presence element of a bona fide residence is easy to police, the subjective intent element is not. It is simply unworkable and futile to require States to inquire into each new resident's subjective intent to remain. Hence, States employ objective criteria such as durational residence requirements to test a new resident's resolve to remain before these new citizens can enjoy certain in-state benefits. Recognizing the practical appeal of such criteria, this Court has repeatedly sanctioned the State's use of durational residence requirements before new residents receive in-state tuition rates at state universities. *Starns* v. *Malkerson*, 401 U. S. 985 (1971), summarily aff'g 326 F. Supp. 234 (Minn. 1970) (upholding 1-year residence requirement for in-state tuition); *Sturgis* v. *Washington*, 414 U. S. 1057, summarily aff'g 368 F. Supp. 38 (WD Wash. 1973) (same). The Court has declared: "The State can establish such reasonable criteria for in-state status as to make virtually certain that students who are not, in fact, bona fide residents of the State,

but have come there solely for educational purposes, cannot take advantage of the in-state rates." *Vlandis* v. *Kline*, 412 U. S. 441, 453–454 (1973). The Court has done the same in upholding a 1-year residence requirement for eligibility to obtain a divorce in state courts, see *Sosna* v. *Iowa*, 419 U. S. 393, 406–409 (1975), and in upholding political party registration restrictions that amounted to a durational residency requirement for voting in primary elections, see *Rosario* v. *Rockefeller*, 410 U. S. 752, 760–762 (1973).

If States can require individuals to reside in-state for a year before exercising the right to educational benefits, the right to terminate a marriage, or the right to vote in primary elections that all other state citizens enjoy, then States may surely do the same for welfare benefits. Indeed, there is no material difference between a 1-year residence requirement applied to the level of welfare benefits given out by a State, and the same requirement applied to the level of tuition subsidies at a state university. The welfare payment here and in-state tuition rates are cash subsidies provided to a limited class of people, and California's standard of living and higher education system make both subsidies quite attractive. Durational residence requirements were upheld when used to regulate the provision of higher education subsidies, and the same deference should be given in the case of welfare payments. See *Dandridge* v. *Williams*, 397 U. S. 471, 487 (1970) ("[T]he Constitution does not empower this Court to second-guess state officials charged with the difficult responsibility of allocating limited public welfare funds among the myriad of potential recipients").

The Court today recognizes that States retain the ability to determine the bona fides of an individual's claim to residence, see *ante*, at 505, but then tries to avoid the issue. It asserts that because respondents' need for welfare benefits is unrelated to the length of time they have resided in California, it has "no occasion to consider what weight might be given to a citizen's length of residence if the bona fides of

her claim to state citizenship were questioned." See *ibid.* But I do not understand how the absence of a link between need and length of residency bears on the State's ability to objectively test respondents' resolve to stay in California. There is no link between the need for an education or for a divorce and the length of residence, and yet States may use length of residence as an objective yardstick to channel their benefits to those whose intent to stay is legitimate.

In one respect, the State has a greater need to require a durational residence for welfare benefits than for college eligibility. The impact of a large number of new residents who immediately seek welfare payments will have a far greater impact on a State's operating budget than the impact of new residents seeking to attend a state university. In the case of the welfare recipients, a modest durational residence requirement to allow for the completion of an annual legislative budget cycle gives the State time to decide how to finance the increased obligations.

The Court tries to distinguish education and divorce benefits by contending that the welfare payment here will be consumed in California, while a college education or a divorce produces benefits that are "portable" and can be enjoyed after individuals return to their original domicile. *Ibid.* But this "you can't take it with you" distinction is more apparent than real, and offers little guidance to lower courts who must apply this rationale in the future. Welfare payments are a form of insurance, giving impoverished individuals and their families the means to meet the demands of daily life while they receive the necessary training, education, and time to look for a job. The cash itself will no doubt be spent in California, but the benefits from receiving this income and having the opportunity to become employed or employable will stick with the welfare recipients if they stay in California or go back to their true domicile. Similarly, tuition subsidies are "consumed" in-state but the recipient takes the benefits of a college education with him wherever

he goes. A welfare subsidy is thus as much an investment in human capital as is a tuition subsidy, and their attendant benefits are just as "portable."[3] More importantly, this foray into social economics demonstrates that the line drawn by the Court borders on the metaphysical, and requires lower courts to plumb the policies animating certain benefits like welfare to define their "essence" and hence their "portability." As this Court wisely recognized almost 30 years ago, "[t]he intractable economic, social, and even philosophical problems presented by public welfare assistance programs are not the business of this Court." *Dandridge, supra,* at 487.

I therefore believe that the durational residence requirement challenged here is a permissible exercise of the State's power to "assur[e] that services provided for its residents are enjoyed only by residents." *Martinez,* 461 U. S., at 328. The 1-year period established in § 11450.03 is the same period this Court approved in *Starns* and *Sosa.* The requirement does not deprive welfare recipients of all benefits; indeed, the limitation has no effect whatsoever on a recipient's ability to enjoy the full 5-year period of welfare eligibility; to enjoy the full range of employment, training, and accompanying supportive services; or to take full advantage of health care benefits under Medicaid. See Brief for Petitioners 7–8, 27. This waiting period does not preclude new residents from all cash payments, but merely limits them to what they received in their prior State of residence. Moreover, as the Court recognizes, see *ante,* at 497, any pinch resulting from this limitation during the 1-year period is mitigated by other programs such as homeless assistance and an increase in food stamp allowance. The 1-year period thus permissibly balances the new resident's needs for subsistence with the State's need to ensure the bona fides of their claim to residence.

---

[3] The same analysis applies to divorce.

Finally, Congress' express approval in 42 U. S. C. § 604(c) of durational residence requirements for welfare recipients like the one established by California only goes to show the reasonableness of a law like § 11450.03. The National Legislature, where people from Mississippi as well as California are represented, has recognized the need to protect state resources in a time of experimentation and welfare reform. As States like California revamp their total welfare packages, see Brief for Petitioners 5–6, they should have the authority and flexibility to ensure that their new programs are not exploited. Congress has decided that it makes good welfare policy to give the States this power. California has reasonably exercised it through an objective, narrowly tailored residence requirement. I see nothing in the Constitution that should prevent the enforcement of that requirement.

JUSTICE THOMAS, with whom THE CHIEF JUSTICE joins, dissenting.

I join THE CHIEF JUSTICE's dissent. I write separately to address the majority's conclusion that California has violated "the right of the newly arrived citizen to the same privileges and immunities enjoyed by other citizens of the same State." *Ante*, at 502. In my view, the majority attributes a meaning to the Privileges or Immunities Clause that likely was unintended when the Fourteenth Amendment was enacted and ratified.

The Privileges or Immunities Clause of the Fourteenth Amendment provides that "[n]o State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States." U. S. Const., Amdt. 14, § 1. Unlike the Equal Protection and Due Process Clauses, which have assumed near-talismanic status in modern constitutional law, the Court all but read the Privileges or Immunities Clause out of the Constitution in the *Slaughter-House Cases*, 16 Wall. 36 (1873). There, the Court held that the State of Louisiana had not abridged

the Privileges or Immunities Clause by granting a partial monopoly of the slaughtering business to one company. *Id.*, at 59–63, 66. The Court reasoned that the Privileges or Immunities Clause was not intended "as a protection to the citizen of a State against the legislative power of his own State." *Id.*, at 74. Rather the "privileges or immunities of citizens" guaranteed by the Fourteenth Amendment were limited to those "belonging to a citizen of the United States as such." *Id.*, at 75. The Court declined to specify the privileges or immunities that fell into this latter category, but it made clear that few did. See *id.*, at 76 (stating that "nearly every civil right for the establishment and protection of which organized government is instituted," including "those rights which are fundamental," are not protected by the Clause).

Unlike the majority, I would look to history to ascertain the original meaning of the Clause.[1] At least in American law, the phrase (or its close approximation) appears to stem

---

[1] Legal scholars agree on little beyond the conclusion that the Clause does not mean what the Court said it meant in 1873. See, *e. g.*, Harrison, Reconstructing the Privileges or Immunities Clause, 101 Yale L. J. 1385, 1418 (1992) (Clause is an antidiscrimination provision); D. Currie, The Constitution in the Supreme Court 341–351 (1985) (same); 2 W. Crosskey, Politics and the Constitution in the History of the United States 1089–1095 (1953) (Clause incorporates first eight Amendments of the Bill of Rights); M. Curtis, No State Shall Abridge 100 (1986) (Clause protects the rights included in the Bill of Rights as well as other fundamental rights); B. Siegan, Supreme Court's Constitution 46–71 (1987) (Clause guarantees Lockean conception of natural rights); Ackerman, Constitutional Politics/Constitutional Law, 99 Yale L. J. 453, 521–536 (1989) (same); J. Ely, Democracy and Distrust 28 (1980) (Clause "was a delegation to future constitutional decision-makers to protect certain rights that the document neither lists . . . or in any specific way gives directions for finding"); R. Berger, Government by Judiciary 30 (2d ed. 1997) (Clause forbids race discrimination with respect to rights listed in the Civil Rights Act of 1866); R. Bork, The Tempting of America 166 (1990) (Clause is inscrutable and should be treated as if it had been obliterated by an ink blot).

from the 1606 Charter of Virginia, which provided that "all and every the Persons being our Subjects, which shall dwell and inhabit within every or any of the said several Colonies . . . shall HAVE and enjoy all Liberties, Franchises, and Immunities . . . as if they had been abiding and born, within this our Realme of *England*." 7 Federal and State Constitutions, Colonial Charters and Other Organic Laws 3788 (F. Thorpe ed. 1909). Other colonial charters contained similar guarantees.[2] Years later, as tensions between England and the American Colonies increased, the colonists adopted resolutions reasserting their entitlement to the privileges or immunities of English citizenship.[3]

---

[2] See 1620 Charter of New England, in 3 Thorpe, at 1839 (guaranteeing "[l]iberties, and ffranchizes, and Immunities of free Denizens and naturall Subjects"); 1622 Charter of Connecticut, reprinted in 1 *id.*, at 553 (guaranteeing "[l]iberties and Immunities of free and natural Subjects"); 1629 Charter of the Massachusetts Bay Colony, in 3 *id.*, at 1857 (guaranteeing the "liberties and Immunities of free and naturall subjects"); 1632 Charter of Maine, in 3 *id.*, at 1635 (guaranteeing "[l]iberties[,] Francheses and Immunityes of or belonging to any of the naturall borne subjects"); 1632 Charter of Maryland, in 3 *id.*, at 1682 (guaranteeing "Privileges, Franchises and Liberties"); 1663 Charter of Carolina, in 5 *id.*, at 2747 (holding "liberties, franchises, and privileges" inviolate); 1663 Charter of the Rhode Island and Providence Plantations, in 6 *id.*, at 3220 (guaranteeing "libertyes and immunityes of ffree and naturall subjects"); 1732 Charter of Georgia, in 2 *id.*, at 773 (guaranteeing "liberties, franchises and immunities of free denizens and natural born subjects").

[3] See, *e. g.*, The Massachusetts Resolves, in Prologue to Revolution: Sources and Documents on the Stamp Act Crisis 56 (E. Morgan ed. 1959) ("*Resolved*, That there are certain essential Rights of the *British* Constitution of Government, which are founded in the Law of God and Nature, and are the common Rights of Mankind—Therefore, . . . *Resolved* that no Man can justly take the Property of another without his Consent . . . this inherent Right, together with all other essential Rights, Liberties, Privileges and Immunities of the People of Great Britain have been fully confirmed to them by *Magna Charta*"); The Virginia Resolves, *id.*, at 47–48 ("[T]he Colonists aforesaid are declared entitled to all Liberties, Privileges, and Immunities of Denizens and natural Subjects, to all Intents and Purposes, as if they had been abiding and born within the Realm of *England*"); 1774 Statement of Violation of Rights, 1 Journals of the

524

The colonists' repeated assertions that they maintained the rights, privileges, and immunities of persons "born within the realm of England" and "natural born" persons suggests that, at the time of the founding, the terms "privileges" and "immunities" (and their counterparts) were understood to refer to those fundamental rights and liberties specifically enjoyed by English citizens and, more broadly, by all persons. Presumably members of the Second Continental Congress so understood these terms when they employed them in the Articles of Confederation, which guaranteed that "the free inhabitants of each of these States, paupers, vagabonds and fugitives from justice excepted, shall be entitled to all privileges and immunities of free citizens in the several States." Art. IV. The Constitution, which superceded the Articles of Confederation, similarly guarantees that "[t]he Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States." Art. IV, § 2, cl. 1.

Justice Bushrod Washington's landmark opinion in *Corfield v. Coryell*, 6 F. Cas. 546 (No. 3,230) (CCED Pa. 1825), reflects this historical understanding. In *Corfield*, a citizen of Pennsylvania challenged a New Jersey law that prohibited any person who was not an "actual inhabitant and resident" of New Jersey from harvesting oysters from New Jersey waters. *Id.*, at 550. Justice Washington, sitting as Circuit Justice, rejected the argument that the New Jersey law violated Article IV's Privileges and Immunities Clause. He reasoned, "we cannot accede to the proposition . . . that, under this provision of the constitution, the citizens of the several states are permitted to participate in all the rights

---

Continental Congress 68 (1904) ("[O]ur ancestors, who first settled these colonies, were at the time of their emigration from the mother country, entitled to all the rights, liberties, and immunities of free and natural-born subjects, within the realm of England . . . Resolved . . . [t]hat by such emigration they by no means forfeited, surrendered or lost any of those rights").

which belong exclusively to the citizens of any other particular state, merely upon the ground that they are enjoyed by those citizens." *Id.*, at 552. Instead, Washington concluded:

"We feel no hesitation in confining these expressions to those privileges and immunities which are, in their nature, fundamental; which belong, of right, to the citizens of all free governments; and which have, at all times, been enjoyed by the citizens of the several states which compose this Union, from the time of their becoming free, independent, and sovereign. What these fundamental principles are, it would perhaps be more tedious than difficult to enumerate. They may, however, be all comprehended under the following general heads: Protection by the government; the enjoyment of life and liberty, with the right to acquire and possess property of every kind, and to pursue and obtain happiness and safety; subject nevertheless to such restraints as the government may justly prescribe for the general good of the whole. The right of a citizen of one state to pass through, or to reside in any other state, for purposes of trade, agriculture, professional pursuits, or otherwise; to claim the benefit of the writ of habeas corpus; to institute and maintain actions of any kind in the courts of the state; . . . and an exemption from higher taxes or impositions than are paid by the other citizens of the state; . . . the elective franchise, as regulated and established by the laws or constitution of the state in which it is to be exercised. These, and many others which might be mentioned, are, strictly speaking, privileges and immunities." *Id.*, at 551–552.

Washington rejected the proposition that the Privileges and Immunities Clause guaranteed equal access to all public benefits (such as the right to harvest oysters in public waters) that a State chooses to make available. Instead, he

endorsed the colonial-era conception of the terms "privileges" and "immunities," concluding that Article IV encompassed only *fundamental* rights that belong to all citizens of the United States.[4]  *Id.*, at 552.

Justice Washington's opinion in *Corfield* indisputably influenced the Members of Congress who enacted the Fourteenth Amendment.  When Congress gathered to debate the Fourteenth Amendment, Members frequently, if not as a matter of course, appealed to *Corfield*, arguing that the Amendment was necessary to guarantee the fundamental rights that Justice Washington identified in his opinion. See Harrison, Reconstructing the Privileges or Immunities Clause, 101 Yale L. J. 1385, 1418 (1992) (referring to a Member's "obligatory quotation from *Corfield*").  For just one example, in a speech introducing the Amendment to the Senate, Senator Howard explained the Privileges or Immunities Clause by quoting at length from *Corfield*.[5]  Cong. Globe, 39th Cong., 1st Sess., 2765 (1866).  Furthermore, it appears that no Member of Congress refuted the notion that Washington's analysis in *Corfield* undergirded the meaning of the Privileges or Immunities Clause.[6]

---

[4] During the first half of the 19th century, a number of legal scholars and state courts endorsed Washington's conclusion that the Clause protected only fundamental rights.  See, *e. g.*, *Campbell* v. *Morris*, 3 H. & McH. 535, 554 (Md. 1797) (Chase, J.) (Clause protects property and personal rights); *Douglass* v. *Stephens*, 1 Del. Ch. 465, 470 (1821) (Clause protects the "absolute rights" that "all men by nature have"); 2 J. Kent, Commentaries on American Law 71–72 (1836) (Clause "confined to those [rights] which were, in their nature, fundamental").  See generally Antieau, Paul's Perverted Privileges or the True Meaning of the Privileges and Immunities Clause of Article Four, 9 Wm. & Mary L. Rev. 1, 18–21 (1967) (collecting sources).

[5] He also observed that, while the Supreme Court had not "undertaken to define either the nature or extent of the privileges and immunities," Washington's opinion gave "some intimation of what probably will be the opinion of the judiciary."  Cong. Globe, 39th Cong., 1st Sess., 2765 (1866).

[6] During debates on the Civil Rights Act of 1866, Members of Congress also repeatedly invoked *Corfield* to support the legislation.  See generally Siegan, Supreme Court's Constitution, at 46–56.  The Act's sponsor,

That Members of the 39th Congress appear to have endorsed the wisdom of Justice Washington's opinion does not, standing alone, provide dispositive insight into their understanding of the Fourteenth Amendment's Privileges or Immunities Clause. Nevertheless, their repeated references to the *Corfield* decision, combined with what appears to be the historical understanding of the Clause's operative terms, supports the inference that, at the time the Fourteenth Amendment was adopted, people understood that "privileges or immunities of citizens" were fundamental rights, rather than every public benefit established by positive law. Accordingly, the majority's conclusion—that a State violates the Privileges or Immunities Clause when it "discriminates" against citizens who have been domiciled in the State for less than a year in the distribution of welfare benefits—appears contrary to the original understanding and is dubious at best.

As THE CHIEF JUSTICE points out, *ante*, at 511, it comes as quite a surprise that the majority relies on the Privileges or Immunities Clause at all in this case. That is because, as I have explained *supra*, at 521–522, the *Slaughter-House Cases* sapped the Clause of any meaning. Although the majority appears to breathe new life into the Clause today, it fails to address its historical underpinnings or its place in our constitutional jurisprudence. Because I believe that the demise of the Privileges or Immunities Clause has contributed in no small part to the current disarray of our Four-

---

Senator Trumbull, quoting from *Corfield*, explained that the legislation protected the "fundamental rights belonging to every man as a free man, and which under the Constitution as it now exists we have a right to protect every man in." Cong. Globe, *supra*, at 476. The Civil Rights Act is widely regarded as the precursor to the Fourteenth Amendment. See, *e. g.*, J. tenBroek, Equal Under Law 201 (rev. ed. 1965) ("The one point upon which historians of the Fourteenth Amendment agree, and, indeed, which the evidence places beyond cavil, is that the Fourteenth Amendment was designed to place the constitutionality of the Freedmen's Bureau and civil rights bills, particularly the latter, beyond doubt").

teenth Amendment jurisprudence, I would be open to reevaluating its meaning in an appropriate case. Before invoking the Clause, however, we should endeavor to understand what the Framers of the Fourteenth Amendment thought that it meant. We should also consider whether the Clause should displace, rather than augment, portions of our equal protection and substantive due process jurisprudence. The majority's failure to consider these important questions raises the specter that the Privileges or Immunities Clause will become yet another convenient tool for inventing new rights, limited solely by the "predilections of those who happen at the time to be Members of this Court." *Moore* v. *East Cleveland,* 431 U. S. 494, 502 (1977).

I respectfully dissent.