[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
By complaint dated October 29, 1999, the plaintiff wife, Robin J. McDaniel, commenced this action seeking a dissolution of marriage on the ground of irretrievable breakdown, custody and support of the minor child, alimony, assignment of property and other relief. The defendant husband, Kenneth J. McDaniel, appeared through counsel on November 8, 1999 and later filed an answer and cross complaint. At the request and agreement of the parties on July 17, 2000, the court appointed Attorney Jeffrey Mickelson as guardian ad litem for the minor child.
Both parties appeared with counsel and guardian ad litem for the minor child with the court hearing evidence on January 23, January 24, January 25, February 6, February 7, February 8, April 25, April 26, May 22, May 23, May 24, with final argument and claims of law submitted by the parties by June 8, 2001. On June 28, 2001, the parties and counsel appeared to answer questions posed by the court to clarify issues raised, issues of law and fact raised by the parties in their written argument and memoranda of law. After hearing and reviewing the testimony and exhibits submitted into the record, the court makes the following findings of fact.
The plaintiff, whose maiden name was Robin J. Lively, and the defendant intermarried at San Angelo, Texas on July 4, 1991. The plaintiff wife has CT Page 12290 resided continuously in the state of Connecticut for one year next preceding the date of the filing of her complaint. The parties have one minor child born to the plaintiff wife since the date of the marriage: Jacob M. McDaniel, born March 22, 1996. No other minor children have been born to the wife since the date of the marriage. The court further finds that no state or municipal agency has contributed to the support of the parties and/or the minor child.
The plaintiff wife was born in Glasgow, Kentucky on July 8, 1969. She resided with her family until graduation from high school. Following her high school graduation, she moved from her family's residence to Florida then to California and to Euless, Texas, a town near Dallas, where her sister Tracy resided. While living in Euless, Texas, she acquired a job at a day care center. She met the defendant in September 1990, and after a short courtship, she quit her job in January 1991 and moved to San Angelo, Texas to live with her future husband. In addition to job experience as a day care worker, the plaintiff was employed in the gaming industry as a casino dealer on the Carnival Cruise Oceanliners.
While residing together, the plaintiff did not work outside of the home by agreement with her husband until 1994 when the defendant purchased a one-third interest in a travel agency where the plaintiff remained in gainful employment until October of 1995. Said employment was the only full-time employment by the plaintiff outside of the marital home since 1991. The plainiff presently enjoys good physical health, but her emotional state has been affected by the stresses of the breakdown of the marital relationship and prosecution of the present divorce action.
The defendant husband, who is nine years older than the plaintiff, was born and raised in Texas. He earned a bachelor's degree from Texas AM and a Masters degree in Business Administration from the University of Texas in 1992. The defendant has been employed for the past eighteen years as a broker for Edward Jones Company. At an early point in his career, the defendant worked as a broker in New England. While working in Rhode Island, the defendant met his first wife, Nancy Nowak. They married and moved to Texas, the state of residence during the marriage. The former Mrs. McDaniel and the defendant were blessed with the birth of a daughter named Sandra, who was born in 1988. Their marital union unfortunately ended in a divorce with the former spouse and daughter returning to Cumberland, Rhode Island, where they presently reside. At the time of the marriage of the parties to the present controversy, the defendant had worked for Edward Jones Company for approximately seven years. Since the date of the marriage of the plaintiff and defendant to the present day, the defendant has been continually employed as a broker for Edward Jones Company. CT Page 12291
The court finds that the plaintiff, who is presently unemployed, has not made reasonable efforts to obtain substantial, gainful employment since the commencement of the dissolution of marriage action. Venuti v.Venuti, 185 Conn. 156, 161 (1981); Lucy v. Lucy, 183 Conn. 230, 234;Miller v. Miller, 181 Conn. 610, 611-12 (1980). The court, as previously found at the pendente lite hearing, concludes that the plaintiff has an earning capacity of at least $280 per week. The court makes this finding with the knowledge that the defendant has skills in working with children in a day care setting, ownership and operation of a travel agency and dealer skills in the gaming industry. The plaintiff has made no reasonable efforts to obtain employment in a day care facility, travel agency and/or gaming industry. She operates a four-wheel drive luxury vehicle, which is more than adequate transportation to pursue a suitable job. The plaintiff's twenty-four-hour-a-day involvement with the child is unreasonable in light of the circumstances and present finances of the parties. The court concludes that the plaintiff should have been out working rather than staying home on a regular basis. She has refused to seek gainful employment during the pendency of these proceedings. The court further concludes that the plaintiff's earning capacity should increase in the future with retraining and certification in the gaming industry assuming the defendant chooses to explore employment opportunities in Connecticut.
As to the earning capacity of the defendant, the court concludes that the defendant at the present time is working to his earning capacity as a broker in the West Hartford office of Edward Jones. The court, as discussed below, is well aware of the paltry income presently earned by the defendant in relation to the substantial income enjoyed by the defendant and his family while operating his flourishing brokerage office in San Angelo, Texas. The court concludes that the defendant's income on a weekly basis is $1600. The court concludes that his weekly earnings have fluctuated in the recent past due to the termination of an incentive income received from Edward Jones while taking over the office in West Hartford, that was abandoned by a previous broker. The court also concludes that defendant's income will increase in the near future once the interruptions and stresses of the divorce action have concluded. Once the defendant can devote his business day to expanding his business, his income should appreciate accordingly.
The parties spent the majority of their marital life as residents of the State of Texas. The plaintiff assumed the role of a happy homemaker, while the defendant worked as a stockbroker/investment advisor continuing to build his business and increase his income and assets. The plaintiff worked for a short period of time as a one-third interest owner and operator of a travel agency from 1994 until October 1995, when she became pregnant. The court finds that the marital relationship between the CT Page 12292 parties was a healthy and good one up until the time of the plaintiff's pregnancy. While visiting her family in Kentucky during her seventh month of pregnancy, she re-established a relationship with an old boyfriend resulting in sexual intercourse. Said affair was not known by the defendant until after their son's birth. The plaintiff acknowledged to the defendant in July of 1996 that she had been involved in an affair before the birth of their son. Jacob was born on March 22, 1996.
The defendant first learned of his wife's infidelity sometime in 1996. Said revelation resulted in a meltdown of the marital relationship between the plaintiff and defendant. After discussions with the plaintiff and intervention of her friends, the plaintiff and defendant agreed to commit themselves to one another to save the marriage and the family. The plaintiff and defendant commenced counseling in the State of Texas.
While residing m Texas, the defendant's business flourished in the number of accounts and income from the date of the parties' marriage through calendar year 1996. The defendant enjoyed the challenge of cultivating new clientele and increasing success of his brokerage agency. The defendant earned more than $300,000 per year in adjusted gross income for calendar year 1996. (See Plaintiff's Exhibit 1). The parties were living in the lap of luxury in an upper-level residential area where the plaintiff attended to the needs of her child and family, while the defendant worked, played golf and furthered developed his flourishing brokerage business.
In 1996, after the revelation of the plaintiff's infidelity, the parties discussed future plans and conditions required to save their marital relationship. The plaintiff contends that she agreed to move to the Northeast only at the request of the defendant. She claims that the defendant told her that the move would be beneficial to his plan to become a partner of Edward Jones. She further contended that defendant indicated that the relocation would be for a relatively short period of time after which the parties could move.
The defendant contends that the plaintiff established as a precondition for a resolution of the marital dispute that the parties move away from Texas. The defendant advised the court that the plaintiff's apparent reason for the move out of Texas was the knowledge of family and friends in Texas about her affair with her ex-boyfriend in Kentucky. The defendant further testified that he agreed to move knowing that he would be forced to give up his San Angelo brokerage business and income. He earned more than $350,000 per year in 1995, over $300,000 in 1996 and higher income in 1997 and 1998, which was partially caused by sale of his business interests in Texas. (See Plaintiff's Exhibits 2, 3 and 4.) CT Page 12293
The court also heard testimony from Edward Jones' area leader, Guy Cascella, and Eastern area leader, Price Woodward, in addition to the testimony of the defendant concerning his business dealings with the brokerage company. The court finds the testimony of the defendant and the representatives from Edward Jones to be credible as to the intentions of the defendant in moving his family out of Texas and the resultant loss in business and income flowing therefrom. The court finds that the defendant pursued a job transfer from Texas after the parties agreed to the move. The court finds that the defendant agreed to move from the State of Texas as a requirement to save his marriage with the plaintiff, motivated in part by the failure of his first marriage, physical separation from his daughter, and the need to keep the present family together. The defendant further agreed to move understanding that relocation had financial risks involved.
The court further finds that the move of the plaintiff, defendant and Jacob from Texas required the defendant to transfer his entire business in San Angelo to third parties. He entered into the corporate "goodnight" programs, resulting in the divestiture of the defendant's interest in the San Angelo agency and client accounts. In October 1996, the defendant started recruiting brokers for Edward Jones in several areas in Texas to gain added experience and to help improve his position in obtaining his ultimate goal; i.e., a partnership with Edward Jones. The defendant in December of 1996 formally entered into the divestiture process with Cecil Ross, who agreed to take over the majority of the defendant's business while a smaller portion was transferred to another broker by a second "goodnight" program.
While entering into the "goodnight" programs with the purchasers of his business, the defendant sought assistance from his area manager, Guy Cascella, in his attempts to relocate to the Northeast with his family. Mr. Cascella advised the defendant that the Eastern area leader, Price Woodward, was establishing an experimental recruiting position planned for the Northeast. Mr. Cascella contacted Mr. Woodward regarding the defendant's interest to move into the area that was the subject of the experimental recruiting program. The position was offered to the defendant without the direct prospect of a general partnership. The defendant initially refused the position, but after conferring with his wife, agreed to seek employment within the Northeast as an agent for Edward Jones. He also explored employment with other companies. After interviewing with potential new positions with competitors to his present company, the defendant signed on with Edward Jones in the experimental recruiting position and received a salary of $157,000. (See Plaintiff's Exhibit 18.)
The court further finds it credible that the plaintiff and defendant CT Page 12294 conferred with each other and were in agreement that they would move to the Northeast. The plaintiff knew they would be closer to Sandy and would attempt a fresh start in reconciling their differences. The court further concludes that the defendant accepted the new position with Edward Jones with all of its risks and potential rewards with full knowledge that said recruiting position would not directly lead to a partnership with Edward Jones. The court concludes that the move to Connecticut was not directly linked to a partnership. Said move was not for a short period of time as testified to by the plaintiff. The court concludes that the defendant's explanation is to be given more weight; i.e., that the parties moved to save their marriage, be closer to Sandy, all with full knowledge that acceptance of the experimental recruiting position was not a guaranteed permanent position.
The court also finds that the defendant further accepted the position in West Hartford after interviewing with other firms with the knowledge and consent of his wife. The plaintiff, defendant and Jacob moved to Avon, Connecticut, subsequent to the wife's research of the school system and residential areas around Hartford, Connecticut. The parties chose Avon as a result of the wife's review of the long-term educational benefits for their child in the Avon school system and I the proximity of a planned new elementary school in the immediate area of the parties' newly purchased home at Oakengates. Said home was purchased after the parties' sale of their home in Texas and move to Connecticut in late 1998.
While residing in Avon, the parties continued marital counseling. The parties' reconciliation attempts in Connecticut lasted for a short period of time when the plaintiff, as a result of alleged physical abuse, obtained an ex parte restraining order against the defendant. Said restraining order required the defendant to remove himself from the family residence. The plaintiff commenced the present dissolution of marriage action against the defendant shortly after she obtained the ex parte relief. The plaintiff has resided in the marital home with the minor child through the present date. Parenthetically, shortly before filing for the divorce, the plaintiff saw fit to purchase a luxury sports utility vehicle with a minimal down payment and a substantial secured car loan as reflected on her financial affidavits.
As to the cause or causes for the breakdown of the marriage, the court finds both parties equally at fault for the demise of their relationship. The court is left with an economic mess to resolve in conjunction with the most important task: who will raise the only issue of the marriage, Jacob.
The parties are at loggerheads as to the issue of residential custody CT Page 12295 of the minor child, Jacob. The plaintiff contends that Jacob should be placed in her physical possession and be permitted to move to Kentucky. She and Jacob would reside in the basement of the home of the plaintiff's sister in living quarters not yet constructed. The defendant, who initially did not seek primary residential custody, wants the court to order shared physical custody with the child to remain in Connecticut to be raised by both parents with the assistance of his mother, who lives with the defendant since her recent move from Texas. The defendant presently resides in an apartment, requiring grandmother to sleep on the couch in the living room when Jacob visits.
The parties, in response to the briefing orders of the court, agree that the holding of Ireland does not apply to the present controversy.Ireland v. Ireland, 246 Conn. 413 (1998). The court concurs with the conclusion of the parties. In addition to the reasons set forth by the parties in their memoranda of law, the court further concludes that the parties never raised the issue of relocation by a party with the minor child until the plaintiff made her desire known to relocate with the minor child to Kentucky. Said desire was voiced months after November 3, 1999 when the trial judge in Hartford Superior Court granted the restraining order, which included a custody order in favor of the plaintiff. On November 16, 1999, the parties agreed to transfer the restraining order file to New Britain Superior Court to be consolidated with the present dissolution action. The parties also agreed to a parenting schedule that was modified in New Britain Superior Court on December 13, 1999. This Agreement also stated that all previous orders remained in effect without prejudice until February 14, 2000, when all orders were to be reviewed. The review did not take place and no hearing was held.
The plaintiff contends that custody order originally granted with the46b-15 application was incorporated and made part of the agreement in the divorce file on December 13, 1999. The defendant contends to the contrary claiming that the 46b-15 custody order was not incorporated into the divorce file orders and further that no hearing took place on or before June 13, 2000. (six months after December 13, 1999, the last date it was continued) resulting in the expiration of the custody order.
The court concludes that for the purpose of determining whether theIreland relocation test applies to the present case, it is a distinction without a legal difference. The parties have operated, throughout the proceeding, under the assumption that the minor child primarily resided with his mother with the father's access as agreed to in the various parenting orders in the file. Furthermore, the court never held a hearing where the parties contested the custody and location of the minor child prior to any custody order previously issued. The defendant was unaware of CT Page 12296 the plaintiff's desire to relocate with the minor child until months after the initial restraining orders and custody and access orders were issued. The court further finds that while Ireland is not dispositive as to the burden of proof test, it is informative regarding the issue of relocation. The issue of physical custody must be determined by the trial court using the standards set forth in § 46b-56 (b), taking into consideration the location or relocation of the child. Blake v. Blake,207 Conn. 217 (1988); Hill v. Hill, 22 Conn. L. Rptr. 18, 634 (Nov. 2, 1998).
Connecticut General Statutes § 46b-56 (b) states in part that:
 In making or modifying any order with respect to custody or visitation, the court shall (1) be guided by the best interests of the child, giving consideration to the wishes of the child if the child is of sufficient age and capable of forming an intelligent preference, provided the initial order the court may take into consideration the causes of the breakdown of the marriage or legal separation if such causes are relevant in a determination of the best interests of the child. . . .
It is clear by the case law and statutory language that the court must determine what is in the best interest of the minor child and not the plaintiff or defendant when the court decides who should have custody and where the child shall reside. The guardian for the minor child concluded that the minor child's best interests are served if he is raised by both parents. He stated that his ward enjoys and needs contact with both his mother and father on a consistent and regular basis. The family relations officer who performed the court ordered evaluation also concurred.
In determining the best interests of the child in the present controversy, the court is faced with the balancing of all of the factors that affect the child's welfare. The plaintiff argued that her desire to "move back home" to Kentucky should be given substantial weight. She claimed that the parties' move to Connecticut was only temporary. She never intended to reside here permanently and with the disintegration of the family unit has no reason to stay here. She also claimed that her family is primarily located in Kentucky leaving her with an inadequate support system here in Connecticut. She intends to move into an apartment with her sister's family and raise her son. She further proposed regular contact between Jacob and the defendant by means of on-line visitation, e-mail and phone, in addition to in-person visitation. She seeks joint legal custody, primary residence and joint decision making with disputes settled by arbitration. CT Page 12297
In performing its balancing act regarding the best interest of the child, the court has considered the burden of proof standards inIreland. The court finds that the decision of the plaintiff wife to relocate to Kentucky, nearer her family, is for a legitimate purpose. The court understands the personal wants and needs of the plaintiff to feel safe and secure in residing with a sibling closer to her extended family. The proposed move with Jacob requires the court, however, to determine the best interest of the child, not the emotional and psychological needs of his mother.
In determining whether the plaintiff's move to Kentucky is reasonable in light of that purpose, the court finds that the plaintiff intends to move to Kentucky without a job. She further failed to investigate specific educational opportunities for Jacob in the school district where he will be educated. The plaintiff also testified that she intends to seek future employment as a nurse. The plaintiff failed to present evidence that she has a sufficient high school record, and/or meets the admission standards for acceptance into a nursing program in proximity to her proposed residence in Kentucky, Connecticut or any other location. The court concludes that the plaintiff failed to meet the second prong of the Ireland test. Even if the Ireland standard of proof test applies to the present controversy, the defendant, based upon the testimony and documentary evidence, has convinced the court that it is not in the best interest of Jacob to relocate to Kentucky with his mother.
The defendant claims that the parties should raise Jacob together in Connecticut under a shared parenting order wherein disagreements as to the parenting of Jacob are resolved by a complex mediator — arbitrator system. The defendant contended that Jacob should be raised by both parents with child care provided for by the paternal grandmother. She testified that she would stay in Connecticut and babysit for Jacob. The defendant testified that Jacob would be close to his half-sister who presently resides with her mother in Rhode Island. He further contended that the evidence shows that the plaintiff could obtain a nursing degree in 2-2 1/2 years through enrollment in a local state college. He also contended that Jacob should continue to receive therapy and counseling through Dr. Danitz, his present therapist. He further argued that both parents would live in close proximity to each other and raise their child with love and attention from both parents, which coincides with the opinion of the guardian ad litem and family relations.
In analyzing the best interests of the child re custody, the economics of the present controversy must be scrutinized. The parties have expended substantial sums of money, well over $100,000, on lawyers' fees, guardian ad litem fees to date, incurred through trial of the case. The CT Page 12298 plaintiff, as previously stated, purchased a new car with the majority financed at, or about the time of the separation of the parties. The plaintiff and Jacob have lived alone in the family residence since November 1999. She has not sought substantial gainful employment and has chosen to stay at home requiring the defendant to support the family.
The defendant has seen his income decrease from $350,000 in 1995, while working in San Angelo, Texas, to an amount less than $100,000 in 2001. The defendant filed multiple financial affidavits in 2001, ranging from a low of $1104 gross per week (5/23/01 Plaintiff Exh. 22) to a high of $1600 gross per week on May 22, 2001 and April 25, 2001. The plaintiff and defendant have exhausted all of their cash and have maxed out their credit cards. They have borrowed their maximum available on their home equity line while the defendant has liquidated all investment and/or retirement asserts presently available. The parties, in final argument, agreed to sell the marital residence but dispute the use of the proceeds of the sale.
The partes are left with a claim of equity between $49,687 and $80,500 in the marital home according to the lay opinions of the plaintiff and defendant, respectively. Neither party saw fit to pay for a real estate appraisal and present expert evidence as to value. The defendant's 401(k) has a present value (pre-tax) of $162,000, and his profitsharing plan is presently worth $181,000. The defendant also has an interest in a limited partnership (nonassignable but transferable to the plaintiff or liquidable for a meager amount) of $224,000 pre-tax. Said limited partnership interest is tied to his employment as a broker for Edward Jones and will remain an asset of the defendant. The plaintiff, aside from her equity in the marital residence, furniture and car, has debts that she has incurred while residing separate and apart from the defendant.
Clouding the economic picture even further is the lack of present income of the defendant and the plaintiff to sustain themselves in the lifestyle they have been accustomed to throughout their marriage. The parties, by the orders in this judgment, shall be required to sell the marital residence as soon as economically feasible. The parties will be required to live in substantially less luxurious accommodations than their homes in San Angelo, Texas and Avon, Connecticut.
Based upon the testimony and exhibits presented in the record, the court concludes that the defendant's income will probably increase once the stresses and time consumed by this marital dispute have ended. The defendant will be able to devote his time and effort to increasing his client base in his West Hartford office. The court further concludes, as argued by the plaintiff, that her pursuit of a nursing degree (in Connecticut and/or Kentucky) with completion in three years "became more CT Page 12299 and more whimsical as the trial continued. . . ." (Plaintiff's Trial Brief, p. 25). The plaintiff has failed to even inquire (at a college in Connecticut and/or Kentucky) as to whether she meets the core course and academic requirements for enrollment in a nursing school. To conclude that she will apply, enroll and complete her studies in two to three years while employed full-time or part-time is speculative and based on conjecture. The court finds that the plaintiff is best suited for full-time employment in the gaming and/or travel industry based upon her previous employment as a dealer and operator of a travel business in Texas.
The court has reviewed the arguments and claims of law briefed by the parties in their written briefs of June 8, 2001. The court held a hearing on June 28, 2001, where counsel for the parties answered questions posed by the court to clarify issues involving the assets of the parties, custody of the minor child, and future education of the plaintiff. The plaintiff will need to seek full-time employment, new living quarters and have sufficient money available until her income increases to meet life's expenses and unforeseen future financial pitfalls. The defendant shall also assist the plaintiff by paying child support based upon the child support guidelines and periodic alimony payments to help the wife support herself
The defendant, in turn, will need to spend as much time as reasonable to cultivate new clients and increase his net income at Edward Jones. If his income does not increase, he will need to seek employment with a competitor of his employer. The defendant cannot rely on his mother for the rest of Jacob's minority to act as a caretaker. The parents must take a "hands-on," active role in raising their son. The court is left with the decision as to where and how the child's upbringing will occur.
The plaintiff argues that her constitutional right to travel will be violated if she is not allowed to return to Kentucky with Jacob. In support of this argument the plaintiff cited 16B Am.Jur.2d, Constitutional Law § 613.[1] Although this section of Am.Jur. discusses the fundamental right to travel, it is devoid of discussion in the context of dissolution of marriage and relocation with a child outside of the child's current home state where the child's noncustodial parent resides. Even though the parties did not adequately brief the issue, the court will discuss it fully.
The constitutional challenge presented by the plaintiff is a case of first impression in this state. The court, therefore, looks to the law of other jurisdictions as well as the law of the United States Supreme Court. "The `strict scrutiny' standard of constitutional review applies where the violated interest is a fundamental personal right or civil CT Page 12300 liberty, such as the right to interstate travel." 16A Am.Jur.2d, Constitutional Law § 576 (1998). "A right is fundamental for purposes of equal protection analysis if it is explicitly or implicitly guaranteed by the constitution." Zapata v. Burns, 207 Conn. 496, 505, 542 A.2d 700
(1988).
"The word `travel' is not found in the text of the Constitution. Yet the `constitutional right to travel from one State to another' is firmly embedded in our jurisprudence. United States v. Guest, 383 U.S. 745, 757
(1966). Indeed, as Justice Stewart reminded us in Shapiro v. Thompson,394 U.S. 618 [89 S.Ct. 1322, 22 L.Ed.2d 660] (1969), [overruled on other grounds, Edelman v. Jordan, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662
(1974)], the right is so important that it is `assertable against private interference as well as governmental action . . . a virtually unconditional personal right, guaranteed by the Constitution to us all.' Id., at 643 (concurring opinion)." Saenz v. Roe, 526 U.S. 489, 498,119 S.Ct. 1518, 143 L.Ed.2d 689 (1999).
"In Shapiro, . . . [w]ithout pausing to identify the specific source of the right, we began by noting that the Court had long `recognized that the nature of our Federal Union and our constitutional concepts of personal liberty unite to require that all citizens be free to travel throughout the length and breadth of our land uninhibited by statutes, rules, or regulations which unreasonably burden or restrict this movement.' Id., at 629. . . . We further held that a classification that had the effect of imposing a penalty on the exercise of the right to travel violated the Equal Protection Clause `unless shown to be necessary to promote a compelling governmental interest,' id., at 634. . . ." Saenzv. Roe, supra, 526 U.S. 499.
"The `right to travel' discussed in our cases embraces at least three different components. It protects the right of a citizen of one State to enter and to leave another State, the right to be treated as a welcome visitor rather than an unfriendly alien when temporarily present in the second State and, for those travelers who elect to become permanent residents, the right to be treated like other citizens of that State." Id., 500. "The right of free ingress and regress to and from neighboring States, which was expressly mentioned in the text of the Articles of Confederation . . . may simply have been conceived from the beginning to be a necessary concomitant of the stronger Union the Constitution created." (Internal quotation marks omitted.) Id., 501.
"The second component of the right to travel is, however, expressly protected by the text of the Constitution. The first sentence of Article IV, § 2, provides: `The Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States.'" SaenzCT Page 12301v. Roe, supra, 526 U.S. 501. The source of the third aspect of the right to travel "is plainly identified in the opening words of theFourteenth Amendment: `All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States;. . . .'" Saenz v. Roe, supra, 503.
Restricting the plaintiff from relocating with the child to another state outside the state of Connecticut without providing notice to the defendant, filing a motion to modify and appearing before the court to argue the motion, does not affect the plaintiff's right to travel because it does not interfere with her individual fundamental right to enter and leave another state, be treated as a welcome visitor in another state or be treated like any other citizen of Connecticut who voluntarily subjects herself to the jurisdiction of the court by filing a dissolution action. Based upon the law of the United States Supreme Court, this court finds that the plaintiff's fundamental right to travel is not constitutionally impaired. The father of the child is subject to the same requirements as the mother when relocation is involved and, although not raised by the defendant, the court concludes that his fundamental right to travel is also unimpaired. Furthermore, based on the evidence presented by the plaintiff, or the lack thereof, this court finds it is in the minor child's best interest that neither party remove the child from this state with the intent of changing their residence or domicile without a court order. If the parties subsequently reach an alternative agreement, the agreement must be in writing and submitted to the court for review and determination on the issue of relocation.
Other jurisdictions that analyzed the issue raised by the plaintiff have concluded that a restriction on relocation does not violate a person's fundamental right to interstate travel. In Rowsey v. Rowsey,174 W. Va. 692, 696, 329 S.E.2d 57, 61 (1985), the West Virginia Supreme Court of Appeals . . . recognized a right to travel, under the Federal Constitution. . . . The paramountcy of child welfare may, however, supersede the right to travel." (Citation omitted.) Rowsey v. Rowsey, supra, 696.
"A Kansas court of appeal recently determined that the right to travel may be affected by the needs of the children involved in a custody dispute. In Carlson v. Carlson, 8 Kan. App. 2d 564, 661 P.2d 833 (1983) . . . [w]ithout specifically discussing whether a `compelling governmental interest' test should be utilized, the Kansas appellate court . . . stated that the legitimate state interest in restricting the residence of a custodial parent to further the best interests of a child had priority over the parent's right to travel. Noting that the CT Page 12302 plaintiff's right to travel was limited only by her desire to retain her status as the custodial parent, the court held that a divorced parent to whom custody of minor children has been entrusted . . . may be required to forego or forfeit some rights to custody or visitation, as the case may be, consistent with the best interests and welfare of the children and the rights of the other parent. 661 P.2d at 836." (Internal quotation marks omitted.) Ziegler v. Ziegler, 107 Idaho 527, 534, 691 P.2d 773, 780
(1985).
"In virtually every case of divorce where young children are involved they are the innocent victims. There is no dispute that the best interest of the children dictates that they should have the love, support, guidance and companionship of both their parents. . . . Providing and assuring the maximum opportunities for parental love, guidance, support and companionship is a compelling state interest that in my opinion warrants reasonable interference with the constitutional right of travel when necessary. The evidence in this case clearly supports the trial court's determination that some reasonable interference with unrestricted rights of travel was necessary. There was great acrimony and bitterness between the parties; both parties expressed very strong attachment and desire for the children . . . both parties at times had made expressions indicating thoughts of removing themselves and the children beyond the jurisdiction of the Court and beyond practical means for the other parent to visit with the children. These facts would certainly support the trial court's inference and conclusion that there was danger that either of the parties might take the children and flee thus depriving the other parent of reasonable visitation and depriving the children of the parental love, affection, support, guidance and companionship to which they were entitled." Id., 534-5, 780-81.
In determining whether restriction on travel is not overly broad, the court in Ziegler concluded that "[t]he wording of the trial court's decree [did] not restrict plaintiff's right of travel for temporary purposes such as vacation, business or visitation of relatives. [The] [p]laintiff herself would be at liberty to change her place of residence without permission or order of the Court at any time she saw fit. . . . The only restriction . . . imposed was that the place of residence of the children not be changed to a point beyond a radius of 100 miles from [the residence] without a prior Court order." Id., 535, 761.
The court further noted "that the magistrate did not flatly prohibit the parties from moving more than 100 miles from [the children's residence]. The magistrate simply required that such a move be authorized by a prior court order. The manifest purpose of this requirement was to enable the court to assess the impact of a proposed move upon the parties and the children, and to enter whatever order, if any, might be needed to CT Page 12303 protect the children's best interests and to minimize the adverse effect upon the parties' custodial and visitation rights." Id.
In the present case, this court is proceeding in the same manner as did the court in Ziegler. The plaintiff is free to move out of the state of Connecticut if she decides she does not require the minor child to reside with her and she is free to return to court seeking to modify the current order. The court finds such a requirement to be in the best interest of the child which, as previously stated, can override the fundamental constitutional right to travel.
"Other courts generally balance a custodial parent's fundamental right to travel with the state's compelling interest in the best interests of the children. The Montana Supreme Court articulated its standard as follows: We believe that furtherance of the best interests of a child, by assuring the maximum opportunities for the love, guidance and support of both natural parents, may constitute a compelling state interest worthy of reasonable interference with the right to travel interstate. . . . We caution, however, that any interference with this fundamental right must be made cautiously, and may only be made in furtherance of the best interests of the child. To that end, we require the parent requesting the travel restriction to provide sufficient proof that a restriction is, in fact, in the best interests of the child. . . . Other states apply similar standards. See, e.g., LaChapelle v. Mitten, 607 N.W.2d 151, 163
(Minn.Ct.App. 2000) (protection of the best interests of the child a compelling state interest justifying depravation of fundamental right to travel, raise one's child); Watt v. Watt, 971 P.2d 608, 615-16 (Wyo. 1999) (`The right of travel enjoyed by a citizen carries with it the right of a custodial parent to have the children move with that parent. This right is not to be denied, impaired, or disparaged unless clear evidence before the court demonstrates another substantial and material change of circumstance and establishes a detrimental effect of the move upon the children.'); Clark v. Atkins, 489 N.E.2d 90, 100 (Ind.Ct.App. 1986) (`The law has few objectives more compelling than protecting the interests of children. Where families have suffered the trauma of divorce those interests include not only the care and custody of the child but its right and obligation to know and visit with a noncustodial parent.'. . . Carlson v. Carlson, 661 P.2d 833, 836
(Kan.Ct.App. 1983) (`[A]s to a divorced parent to whom custody of minor children has been entrusted, such person may be required to forego or forfeit some rights to custody or visitation, as the case may be, consistent with the best interests and welfare of the children and the rights of the other parent.'); In re Marriage of Manuele,438 N.E.2d 691, 695 (Ill.App.Ct. 1982) (`[T]he protection of petitioner's rights of visitation would justify a reasonable residential restriction as a condition of respondent's custody of the CT Page 12304 children.')." (Citation omitted.) In re marriage of Schaben, Court of Appeals of Iowa, Docket No. 0-226, 99-0674, September 13, 2000.
"Although the courts articulate similar standards, the outcomes differ depending on the facts and circumstances of a particular case. See,e.g., Watt, 971 P.2d at 616 (father failed to meet his burden of demonstrating a material and substantial change of circumstances had occurred, sufficient to justify ordering a change in custody, where mother and children moved beyond the 50 mile limit provided for in the decree); D.M.G., 951 P.2d at 1383 (father failed to meet his burden to provide legally sufficient proof the best interests of the parties' children would be most appropriately served by requiring mother and children to relocate to Helena, Montana, where father resided, from Salem, Oregon); Manuele, 438 N.E.2d at 695 (restriction conditioning mother's physical custody of the children upon her continuing to live in the county was unreasonable). Compare, e.g., Everett v. Everett,660 So.2d 599, 601-02 (Ala.Civ.App. 1995) (residential restriction served the best interests of the children, thereby overriding mother's constitutional right to travel); Zeigler, 691 {/2d at 780-81 (100 mile radius restriction was reasonable, not overly broad under the circumstances).
"In contrast, some cases conclude conditioning custody upon relocation has no effect on the custodial parent's right to travel. See, e.g.,LaChapelle, 607 N.W.2d at 164 (`[T]he trial court did not restrict [custodial parent's] right to remain in Michigan; the court only required [the child] to be returned to Minnesota. Any burden on [custodial parent's] right to travel arises from her desire to remain [the child's] sole physical custodian.'); Clark, 489 N.E.2d at 100 (`[T]he court's order does not impose any necessary burden whatever upon her right to travel. She remains free to go wherever she may choose. It is the children who must be returned to Indiana.'); Carlson, 661 P.2d at 836
(`Her right to travel or even to establish residence elsewhere is limited only by her desire to retain her status as the custodial parent.')." Inre marriage of Schaben, supra, Court of Appeals of Iowa, Docket No. 0-226, 99-0674, September 13, 2000.
The court in the present controversy concludes that shared parenting requiring either party to give reasonable notice to the other and to confer with each other prior to filing a motion with the court to relocate outside of Connecticut with Jacob does not violate either parent's constitutional right to travel.
The court has also considered the statutory and common law claims of the parties in its decision re custody. The court has further reviewed the factors applied by the New York Court of Appeals in Tropea referenced CT Page 12305 by our Supreme Court in Ireland. Tropea v. Tropea, 87 N.Y.2d 727 (1996). While these factors are not binding on this court or exhaustive, they give further credence to the court's conclusion that it is in the best interest of Jacob to be raised by both parents.
The minor child has a good relationship with both parents and his half-sister who resides in Rhode Island. The move to Kentucky will impact the quality and quantity of appropriate contact with his father. He will be also benefitted with continued counseling by Dr. Danitz while residing with his parents here in Connecticut. Additionally, Jacob will not be enhanced by moving to Kentucky with his mother in an economic, educational and emotional way. The plaintiff has no job nor has she applied for and obtained acceptance to a nursing program. Jacob's education in Connecticut will be at least equal to any schooling in Kentucky. Jacob's emotional needs can be best met through the love and interaction of both parents. The separation from either parent will only cause more uncertainty and conflict in Jacob's emotional and physical development.
The court is cognizant of the animus between the parties in their legal tug-of-war over Jacob. The plaintiff will have sufficient funds to obtain suitable housing for herself and Jacob but will need to obtain employment. The defendant will need to spend more time to build a business. Jacob can be properly educated wish his psychological and emotional needs met by both parents with the aid of Dr. Danitz. Any parenting disputes will be mediated by the guardian ad litem. The court shall only be used as a last resort to decide disputed parenting issues. The parties are further advised that the time and expense of future litigation can better be spent with and for the benefit of their son.
The court has further considered the plaintiff's claim for relief from her car loan obligation and the defendant's mathematical calculations in furtherance of his claim for pre-marital assets. The court has also considered the disparate earnings and/or earning capacity of the plaintiff and defendant in crafting its orders. The tax ramifications in transferring and/or selling assets have also been weighed by the court. The court has jurisdiction in this matter, and the facts set out in the complaint are proven and/or true. Judgment shall enter dissolving the marriage on the grounds of irretrievable breakdown. It is further ordered that:
1. Custody of Jacob
The plaintiff and defendant shall have joint legal custody of the minor child, Jacob, with a designation of primary residence of the minor child with the plaintiff mother for school registration purposes only. CT Page 12306
2. Parenting Time
The plaintiff and the defendant shall share physical custody and/or parenting time with the minor child as follows:
Defendant's Parenting Time: The father shall have Jacob on every Tuesday picked up at mother's home at 4:00 P.M. overnight to Wednesday with child dropped off at school, day care or mother's home at 8:00 A.M. He shall also have the child every Thursday for dinner with pickup at school, day care or mother's home at 4:00 P.M. and return to mother's home at 8:00 P.M. The father shall also have parenting time with Jacob, every other weekend after school on Friday until the following Monday morning. The father shall pick up from school, day care or mother's residence at 4:00 P.M. and return the minor child to school, day care, or mother's residence by 8:00 A.M. in the morning if school is not in session.
Plaintiff's Parenting Time: The mother shall enjoy her parenting time with Jacob on the days and times father is not exercising his access with the exception of holiday and vacation times, which shall preempt the above parenting time schedule as follows:
1. The plaintiff and defendant shall alternate school vacations and major holidays, which include Thanksgiving, Easter and any religious holidays enjoyed by the parties.
2. The parties shall divide the Christmas vacation with the plaintiff enjoying Christmas Eve from 6:00 P.M. through Christmas morning at 11:00A.M. with the defendant enjoying Christmas Day from 11:00 A.M. to 8:00 P.M. The parties shall divide equally the remaining portion of the Christmas school vacation week.
3. Each party shall enjoy two weeks of uninterrupted summer vacation, consecutive or nonconsecutive. Each party will provide to the other a proposed summer vacation schedule on or before April 1 of each year. In the event of conflict, mother's preference shall prevail in even years and father's preference shall prevail in odd years.
4. The minor child shall be with father on Father's Day from 8:00 A.M. to 7:00 P.M. and with mother on Mother's Day from 8:00 A.M. to 7:00 P.m. The parents' and child's birthdays shall also be shared by the mother and father.
5. The child and nonpossessory parent shall have reasonable access to each other by phone and/or computer. CT Page 12307
3. Residence of the Minor Child
The minor child Jacob shall reside in the State of Connecticut with his plaintiff mother and defendant father. If either decides to relocate out of the State of Connecticut, that party shall advise the other of her or his intention and place of relocation 90 days prior to said move in writing. The parties shall meet with the guardian ad litem, Jeffrey Mickelson, to discuss the appropriate residence and/or residences of Jacob. If the parties agree to a change in orders re custody and/or access as set out in this judgment or cannot agree, thereon, either party shall file a motion with this court requesting modification of this judgment.
4. Decision-Making
a. Each of the parties shall make all decisions regarding the parenting of the minor child (with the exception of nonemergency medical care and counseling) when Jacob is with that particular parent. Neither party shall make plans for Jacob or discuss potential plans with Jacob involving the other parent's parenting time, without the other parent's agreement.
b. The parties shall discuss in advance all major decisions of health (including nonemergency medical care), religion, welfare, education, extracurricular activities, etc. The parties shall consider the opinions of the other parent and work to resolve any differences of opinion they may have regarding major decisions based upon the best interests of Jacob.
c. If the parties cannot agree concerning major issues regarding Jacob, they will mediate their disputes with the guardian ad litem, Jeffery Mickelson, who shall recommend a resolution of said dispute to the parties. If no consensus is reached, either party shall file a motion with this court. The court shall receive testimony from the guardian ad litem concerning his recommendation for resolution of said dispute at said hearing.
5. Pendente Lite Arrearage
The court found a pendente lite arrearage owed by the defendant to the plaintiff of $1716 as of January 17, 2001. The defendant filed motions 132.01 and 132.02 dated August 7, 2000, seeking modification of alimony and child support. On September 19, 2000, the court held a hearing and entered orders on motion number 133.00 regarding invasion of assets. The court finds that the prior trial judge addressed all of the motions when CT Page 12308 it ordered invasion of the equity of the marital property to pay the first mortgage. Furthermore, the defendant never reclaimed his motion to modify the pendente lite motions prior to trial. The defendant is found to be $14,503.42 in arrears in the pendente lite alimony and child support with payment ordered pursuant to the terms of paragraph 14 of the judgment.
6. Child Support
The defendant shall pay child support in the amount of $153 per week by immediate wage withholding. Said support order is based upon the finding by the court that the plaintiff's present earning capacity is $280, and the defendant's present earnings are $1600 per week.
7. Medical Insurance and Expenses
The defendant shall maintain medical insurance for the benefit of Jacob. The parties shall divide the unreimbursed and uncovered health care expenses including but not limited to medical, dental, psychological, orthodontic, optical and prescription expenses: 38 percent paid by the plaintiff and 62 percent paid by the defendant.
8. Childcare
The plaintiff and defendant shall divide reasonable and necessary child day care expenses based upon child support guidelines: 38 percent paid by the plaintiff and 62 percent paid by the defendant.
9. Exemptions
The defendant shall have the right to claim the minor child as an exemption for federal and state income tax purposes.
10. Alimony
The defendant shall pay to the plaintiff periodic alimony in the amount of $200 per week terminating upon the first of the following events: 1) death of either party, or 2) remarriage of the wife.
11. Additional Child Support and Alimony
On January 1, April 1, July 1 and October 1 of each year, the defendant shall provide the plaintiff wife with copies of all records regarding all bonus income, partnership distribution, interest income and cash perks (which information shall include but not limited to the profit and loss statements of Edward Jones, or subsequent employer, and the payroll CT Page 12309 statement of the defendant as an Investment Representative) relating to such income he has received during the preceding three months. On said dates set out above, the plaintiff shall also provide to the defendant copies of all payroll records from employment including pay stubs.
The parties shall adjust quarterly for changes in income, and the defendant shall pay to the plaintiff child support and day care in conformance with the child support guidelines. Any changes to the alimony order set out in paragraph 10 above shall require either party to file a motion to modify said alimony order requiring the moving party to sustain her or his burden to prove a substantial change in circumstances.
12. Life Insurance
The defendant shall maintain life insurance in the amount of $200,000 naming the minor son, Jacob, as the primary and irrevocable beneficiary of 50 percent of the death benefit until such time as both parties have no further obligation to pay child support. The plaintiff shall be the irrevocable beneficiary of the remaining (50 percent) death benefit until the defendant's obligation to pay alimony terminates. The plaintiff shall name the minor child as irrevocable beneficiary on any and all life insurance policies at her future places of employment until both parties have no further obligation to pay child support.
13. Defendant's Limited Partnership
The defendant is awarded all right, title and interest in and to his limited partnership with Edward Jones, valued at $224,000 free and clear of any claim from the plaintiff. The court further finds that the limited partnership value would be substantially diminished if the court were to order the transfer of the interest to the plaintiff wife or liquidation of his interest in the partnership.
14. Defendant's 401(k)
The defendant has a 401(k) plan with a value of $162,000 as of June 28, 2001 hearing date. The defendant shall transfer to the plaintiff the sum of $81,000 (i.e., one-half of said fund), plus or minus proportionate increases or decreases in value of the total fund as of the date of transfer to a rollover IRA or directly to the plaintiff. The plaintiff is responsible to pay any and all federal, state or local taxes resulting from said transfer. The plaintiff shall advise the defendant in writing as to her choice of deposit into a rollover IRA or direct distribution to her within fourteen days of the date of this judgment. The remaining sums shall be the sole property of the defendant. The sum transferred to the plaintiff includes the payment to the plaintiff of the arrearage owed for CT Page 12310 pendente lite alimony and child support set out in paragraph 5 above and takes into consideration the plaintiff's liability on her car loan.
15. Guardian Ad Litem
Jeffrey Mickelson, Esq. shall continue postjudgment in his function as guardian ad litem for the minor child, Jacob, and as such, shall be entitled to contact and involvement with the child's therapist and to file any postjudgment motions that he feels are necessary to protect the best interests of Jacob and the integrity of the judgment, insofar as it affects Jacob.
16. Therapy for Minor Child
The minor child shall continue in therapy with Dr. Danitz until discharge from therapy or further order of the court.
17. Marital Residence
The marital residence located at 26 Oakengates, Avon, Connecticut, shall be immediately placed upon the market for sale and both parties shall fully cooperate in expediting the quickest possible sale of the home at a price agreed upon by the parties or determined by the court. The parties shall list the property for sale within ten days of this judgment. If the parties cannot agree upon the sales price or terms of said listing and/or sale, either party may petition the court for an order. The court shall retain continuing jurisdiction over the sale of said marital residence until transfer of title and disposition of the net proceeds consistent with the terms of this judgment.
The plaintiff shall keep said property in good condition to expedite the sale and shall make the home available at all times to be viewed and inspected by real estate brokers, their agents and prospective purchasers. The plaintiff shall vacate said marital residence prior to closing and transfer of title. The parties shall each receive $10,000 from the sales proceeds. The balance of the sales proceeds shall be used to pay the liabilities set forth in paragraph 24 below.
The plaintiff shall pay the utilities (heat, electric, phone, cable TV, refuse and/or snow removal) accruing from the date of this judgment until the house is sold or she vacates the residence. Neither party is ordered to pay the mortgage and taxes until the house is sold; however, the defendant is ordered to pay the homeowner's insurance until the house is sold.
18. Division of Personal Property
CT Page 12311
The parties shall mediate the distribution of household furnishings, tools, yard care equipment, jewelry, etc. If the parties are in dispute as to the division of any of said personalty, they shall have an independent arbitrator whose decision shall be final and binding upon them. The provision of this order has been formulated by agreement of the parties with the fees and expenses for said arbitrator to be borne equally by the parties.
19. Mortgage Payment
The defendant shall be required to use the $6000 shown on his financial affidavit submitted to the court, dated May 22, 2001, to pay the mortgage through July 31, 2001 as previously ordered by the court.
20. Exchange of Tax Returns
The parties shall exchange copies of all state and federal income tax returns including all schedules and documents filed by April 1 of each year.
21. Automobiles
The plaintiff shall have all right, title and interest in and to the 2000 Toyota 4-Runner, and she shall pay and hold the defendant harmless of any liability on said car loan. The defendant shall have all right, title and interest in and to the 1999 Toyota Avalon.
22. Escrow for Water Damage
The $1400 held in escrow shall be used to repair and paint water damage in the bedroom and any balance remaining, if any, shall be used for any maintenance expenses necessary to make the home appropriate for sale.
23. Defendant's Profit Sharing Plan
The defendant has an interest in a profit sharing plan of Edward Jones valued at $181,000 as of June 28, 2001, the date of the last hearing. The defendant shall transfer to the plaintiff a sum sufficient to pay federal and state income taxes ($15,269 federal taxes; $3380 state taxes) resulting in a net sum sufficient to pay the balance of the liabilities included in paragraph 24 below, after the application of required net proceeds obtained from the sale of the marital home in paragraph 17 above.
The remaining funds in said profit sharing plan shall be the sole CT Page 12312 property of the defendant, free and clear of any claim from the plaintiff.
24. Liabilities
The parties shall pay the following liabilities from the proceeds of the sale of marital residence (net after each party receives $10,000) in paragraph 17 above and transfer of funds to the plaintiff from the defendant's profit sharing plan (net of federal and state income taxes) in paragraph 23 above, as follows:
 a. Attorney Timothy Sheehan (Plaintiff's Allowance to Prosecute) $23,819.00
 b. Attorney Jeffrey Mickelson (Guardian Ad Litem Fees) 10,242.00
c. Unpaid Connecticut Taxes for 1999 3,368.00
d. CPA for 1999 Taxes 1,100.00
e. Chase Visa 15,000.00
f. First USA Visa 23,800.00
g. Providence Visa 9,000.00
h. Citibank Visa 30,000.00
i. Dr. Bradbury 1,400.00
24. Additional Liabilities:
The parties shall pay and hold the other harmless on the remaining debts listed on their financial affidavits. Plaintiff's debts: car loan, Circuit City, James C. Lively, Robert Sharp, Houston Lively, Peter Mains, SNETCO, Cable TV (Direct TV), Avon Family Dentist, Kasden Oil and CLP. Defendant's debts: Betty McDaniel, Charles McDaniel, Jerome Herbert and Frauenglass Eisenberg.
Devine, J.